**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carolyn BROWN, Richard Brown, Dorothy Lewis Brown, Rosa Brown, Shenita Jackson Brown, Defendants–Appellants.**

**No. 91–8167.**

United States Court of Appeals,
Eleventh Circuit.

March 6, 1992.

---

13. *See supra* note 11.

Phillip R. McCorkle, McCorkle, Pedigo & Johnson, Savannah, Ga., for Carolyn Brown.

Neil A. Creasy, Adams, Gardner & Ellis, P.C., Savannah, Ga., for Richard Brown.

Harold R. Yellin, Savannah, Ga., for Rosa Brown.

Aron G. Weiner, Weiner, Shearouse, Weitz, Greenberg & Shawe, Savannah, Ga., for S. Jackson Brown.

John R. Calhoun, Calhoun and Associates, James C. Metts., Gregory N. Crawford, Savannah, Ga., for Dorothy Lewis Brown.

Lamar C. Walter, Asst. U.S. Atty., Savannah, Ga., for U.S.

Before FAY and HATCHETT, Circuit Judges, and GIBSON *, Senior Circuit Judge.

HATCHETT, Circuit Judge:

As a matter of first impression in this circuit, we hold that the government is not required to prove that a defendant was aware of the illegality of money structuring in order to convict for that offense under 31 U.S.C. § 5324(3).

### FACTS

Dorothy Brown (Dorothy), an unemployed public housing tenant, had tried unsuccessfully on two previous occasions to purchase property using various relatives as cosignatories or purported purchasers. In April, 1988, Dorothy Brown solicited Eric Maxwell (Maxwell) to make a fictitious personal loan for the purpose of purchasing a home. Maxwell had recently won a personal injury settlement of over $90,000.

Maxwell eventually agreed to assist Dorothy and her family. On April 22, 1988, Rosa Brown (Rosa), Dorothy's daughter, purchased a $10,000 cashier's check at Carver State Bank in Savannah, Georgia, "with dirty, mutilated U.S. currency." When the teller informed her that the bank would have to file a currency transaction report (CTR), Rosa Brown supplied Eric Maxwell's name as the owner of the funds. The bank filed the CTR accordingly. That same day, Shenita Jackson Brown (Shenita), Dorothy's daughter-in-law, purchased a

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

cashier's check at another bank in the amount of $2,205, listing Eric Maxwell as the remitter. Because the transaction was for an amount less than $10,000, the bank did not file a CTR.

On April 23, 1988, Maxwell watched as Rosa Brown and Carolyn Brown, another daughter of Dorothy Brown, counted out $30,000 in cash from a brown paper bag. They then drove Maxwell to C & S Bank where, with Carolyn Brown's assistance, he bought two cashier's checks using the money from the paper bag. The bank listed Maxwell as the owner of the funds on the currency transaction reports. Later the same day, Maxwell and the Browns met at the office of an attorney to close on the purchase of a home at 602 West 38th Street. Dorothy Brown gave the attorney the cashier's checks and executed a security deed and note in favor of Maxwell. Maxwell immediately gave the note to Carolyn Brown and relinquished the security deed soon thereafter.

On June 23, 1989, Dorothy Brown mortgaged the home she had purchased in order to obtain a $28,000 loan from Old Stone Credit. She told the loan officer that she had purchased the home for cash with money she had earned from her restaurant. After obtaining the loan, Dorothy Brown deposited the proceeds in an account at First Union Bank in the name of "Dorothy's Place," listing herself, her son Richard Brown, and her daughter Carolyn Brown as authorized signatories.

On August 3, 1989, Dorothy Brown and Carolyn Brown attempted to withdraw $18,000 from the Dorothy's Place account at First Union Bank. When told that a currency transaction report would have to be filed, Dorothy inquired whether she could withdraw $10,000. The bank officer replied that she could. While Dorothy and Carolyn Brown discussed what to do, the bank officer overheard them say, "Richard did not want it that way." Carolyn Brown then wrote a new counter check for $10,000, which Dorothy Brown signed and cashed. A few days later, Dorothy Brown cashed another check for $8,000 drawn on the same account.

In May, 1989, Eric Maxwell told an Internal Revenue Service (IRS) agent that he did not loan the Browns the money they used to purchase the house at 602 West 38th Street. On August 29, 1989, Dorothy Brown told the IRS that she withdrew the funds from the Dorothy's Place account in two installments in order to avoid transaction reporting requirements.

In July, 1989, Dorothy and Carolyn twice visited Eric Maxwell's home to question him regarding his cooperation with the IRS. They told him to tell the IRS that he had loaned them the money that they used to buy the house. In addition, Dorothy and Carolyn questioned another potential witness, Lillie Mae Jenkins, regarding her cooperation with the IRS.

## PROCEDURAL HISTORY

A grand jury charged Dorothy Brown, Carolyn Brown, Richard Brown, Rosa Brown, and Shenita Jackson Brown in an eight-count indictment with: (I) conspiracy to defraud the IRS and to evade financial reporting requirements by causing domestic financial institutions to file false currency transaction reports in violation of 31 U.S.C. § 5324(2) and by structuring currency transactions in violation of 31 U.S.C. § 5324(3); (II) and (III) defrauding the IRS and evading financial reporting requirements by causing domestic financial institutions to file false currency transaction reports in violation of 31 U.S.C. § 5324(2) (the Carver State Bank and C & S Bank cashier's checks respectively); (IV) obstruction of justice; (V) and (VI) structuring of cash transactions to avoid the reporting requirements of 31 U.S.C. § 5313(a), in violation of 31 U.S.C. § 5324(3) (the First Union Bank account withdrawals); and (VII) and (VIII) forfeiture.

The jury convicted Dorothy Brown on Counts I, III, V, VI, and VII; Carolyn Brown on Counts I, III, V, and VI; Richard Brown on Counts I and VI; Rosa Brown on Counts I and II; and Shenita Jackson Brown on Count I. The court sentenced Richard Brown to serve eighteen months in prison; Carolyn Brown, fifteen months; Dorothy Brown, twelve months; Rosa

Brown, eight months; and Shenita Jackson Brown, four months. All are appellants in this case.

## CONTENTIONS OF THE PARTIES

All appellants contend that the district court erred in charging the jury that knowledge of the unlawful nature of the act is not an essential element of the crime under 31 U.S.C. § 5324(3), the statute prohibiting structuring of currency transactions. In addition, all of the appellants, except Dorothy Brown, challenge the sufficiency of the evidence. Carolyn Brown also contends that the district court abused its discretion when it allowed the government to recall its key witness, Eric Maxwell, on the second day of trial. Dorothy Brown contends that the district court erred in admitting certain incriminating statements and that she was denied effective assistance of counsel. Richard Brown contends that he was deprived of a fair trial by the prosecutor's closing argument. The government responds that the trial court's rulings were not in error, and the evidence was sufficient to support the verdicts. In addition, the government contends that knowledge of the unlawful nature of the act is not an essential element of the crime under 31 U.S.C. § 5324(3); therefore, the district court committed no error in its charge to the jury.

## ISSUES

(1) Whether the trial court erred in charging the jury that knowledge of the unlawful nature of the act is not an essential element of the crime under 31 U.S.C. § 5324(3), the anti-structuring statute; (2) whether the evidence was sufficient to support conviction of the appellants; (3) whether the trial court abused its discretion when it allowed the government to recall a key witness; (4) whether the trial court erred in admitting evidence of incriminating statements made by Dorothy Brown; (5) whether Dorothy Brown was denied effective assistance of counsel; and (6) whether Richard Brown was substantially prejudiced and deprived of a fair trial

by allegations made in the prosecuting attorney's closing argument.

## DISCUSSION

1. *Mens Rea* Requirement of the Anti-Structuring Statute

All appellants argue that the trial court erred in refusing to charge the jury that knowledge of the unlawful nature of the act is an essential element of the crime under 31 U.S.C. § 5324(3), the anti-structuring statute. Because currency transaction structuring is not inherently unsavory or dangerous they argue, persons who engage in it should not be held criminally liable unless the prosecution shows that such persons knew their conduct was prohibited by law. *Compare United States v. Liparota*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (ignorance of the law a defense to crime of unauthorized acquisition of food stamps because food stamps not physically dangerous) *with United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) *and United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (knowledge of illegality not required to convict for violation of laws prohibiting sale of narcotics and possession of unregistered hand guns, respectively, because narcotics and hand guns are physically dangerous).

The appellants cite *United States v. United States Gypsum Co.*, 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978), to argue that the statute's ambiguity regarding intent entitles them to the benefit of "the rule of lenity": the court should adopt the less harsh of two equally reasonable interpretations of a statute in order to ensure that the statute provides fair warning of prohibited conduct. *See also Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). The appellants further argue that according to the Supreme Court's holding in *United States v. Cheek*, —— U.S. ——, ———-——, 111 S.Ct. 604, 610–11, 112 L.Ed.2d 617, 629–30 (1991), the jury must be allowed to consider the defendants' subjective understanding of the illegality of their acts in order to determine whether they acted

"willfully." Applying these principles to the instant case, the appellants argue they would not have been convicted if the jury had been properly charged. The evidence shows that they did not know it was illegal to structure currency transactions to avoid the reporting requirement.

The government agrees with the appellants that the level of intent required under the anti-structuring statute presents a question of first impression in the Eleventh Circuit. The government urges this court to follow the Second and Ninth Circuits in holding that knowledge of the crime is not an essential element of the offense under the anti-structuring statute. *United States v. Scanio*, 900 F.2d 485, 489–91 (2d Cir.1990); *United States v. Hoyland*, 914 F.2d 1125, 1128–29 (9th Cir.1990). The government also argues that the appellants are not entitled to the benefit of the rule of lenity because the terms of the anti-structuring statute, as found by the courts in *Scanio* and *Hoyland*, are not ambiguous. *Scanio*, 900 F.2d at 489; *Hoyland*, 914 F.2d at 1129. Finally, the government argues that *Cheek* does not compel a different result, because the holding in that case was limited by the unique context of criminal tax litigation.

█ The specific question presented by this appeal is whether the jury must find that the defendant knew that money structuring was illegal for the jury to find that the defendant "willfully" violated the prohibition on money structuring contained in 31 U.S.C. § 5324(3). We hold that the prosecution need not prove the defendant was aware of the illegality of money structuring in order to convict the defendant of that offense under 31 U.S.C. § 5324(3). The government need only prove that the defendant was aware of the bank reporting requirement for currency transactions in excess of $10,000 and sought to evade

those requirements through money structuring.

This interpretation of the *mens rea* requirement of section 5324(3) is supported by the language of the statute, its legislative history, and prior case law.

Under 31 U.S.C. § 5313(a), banks must report currency transactions in excess of $10,000. 31 U.S.C. § 5313(a); 31 C.F.R. § 103.22(a)(1). In turn, section 5324(3) prohibits the structuring of currency transactions "for the purpose of evading the reporting requirements of section 5313(a)." Section 5322(a) imposes criminal penalties for "willful[ ]" violations of section 5324.

█ We agree with the conclusion of the court in *Scanio* that the "willfulness" requirement of section 5322(a) is met where the defendant "(1) knew that the bank was legally obligated to report transactions exceeding $10,000, and (2) intended to deprive the government of information to which it is entitled." *Scanio*, 900 F.2d at 491. As the court noted in *Scanio*, the requirement that conduct be "willful" generally "means no more than that the person charged with the duty knows what he is doing. It does not mean that in addition, he must suppose that he is breaking the law." 900 F.2d at 489 (quoting *American Surety Co. v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925)). Thus, on its face, the statutory language does not require knowledge of the illegality of the act.[1]

This interpretation of the *mens rea* requirement of the anti-structuring statute is grounded in the legislative history of the law. Before the enactment of section 5324(3) in 1986, federal circuit courts of appeal were divided over the question of whether structuring currency transactions constituted a criminal offense. *See* S.Rep. No. 433, 99th Cong.2d Sess. 21 (1986) (listing cases) [hereinafter Senate Report]. In *United States v. Tobon–Builes*, 706 F.2d

---

1. This court has interpreted the word "willfully" in section 5322 to require knowledge of the reporting requirement at 31 U.S.C. § 5316 for currency imports and exports in excess of $10,-000. *See United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir.1984) (defendant who is unaware of the reporting requirement "cannot be expected to recognize the illegality of his otherwise innocent act"). This interpretation is not inconsistent with the one we adopt today with respect to money-structuring. To convict a defendant of money-structuring under section 5324(3); the government must prove that the defendant was aware of the bank reporting requirement and sought to evade it.

1092 (11th Cir.1983), this court relied upon 18 U.S.C. § 2 (aiding and abetting or causing another to commit an offense) and 18 U.S.C. § 1001 (concealing from the government a material fact by a trick, scheme, or device) to find a substantive criminal offense in the defendant's effort to evade the bank reporting requirements through money structuring. 706 F.2d at 1101. The court held that the defendant's "willfulness was clearly established by evidence showing he knew about the currency reporting requirements and that he purposely sought to prevent the financial institutions from filing required reports ... by structuring his transactions as multiple smaller transactions under $10,000." 706 F.2d at 1101. The defendant was held accountable for money structuring without regard to his knowledge of the illegality of the act.

Three years after *Tobon–Builes*, this court found, on different facts, that multiple transactions of less than $10,000 did not constitute a substantive criminal offense. *United States v. Denemark*, 779 F.2d 1559, 1563 (11th Cir.1986). Although the court in *Denemark* distinguished *Tobon–Builes*, 779 F.2d at 1563, the Senate committee considering the proposed anti-structuring provision viewed the two Eleventh Circuit decisions as in conflict with each other. *See* S.Rep. at 21. The Senate committee explained that the new anti-structuring statute would "codify *Tobon–Builes*" and "negate the effect of ... *Denemark*." S.Rep. at 22. Thus, the legislative history indicates that Congress adopted the holding of *Tobon–Builes* when it enacted section 5324(3).

It is highly unlikely that in passing the anti-structuring law, and thereby providing even more notice than the defendant had in *Tobon–Builes*, Congress was somehow imposing an additional requirement that the defendant be aware of the illegality of his or her conduct. The more likely explanation is that Congress adopted the court's holding in *Tobon–Builes* that knowledge of the reporting requirements and intent to evade them constitute the "willful" state of mind required to convict under sections 5324(3) and 5322(a). Indeed, this interpretation is supported by the legislative history. Drawing an example of culpable conduct under the statute, the Senate committee noted:

> A person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the specific intent that the participating bank or banks not be required to file currency transaction reports for those transactions would be subject to potential civil and criminal liability.

S.Rep. at 22. The defendant need not know that his or her conduct is illegal in order to be held liable under the statute. Mere knowledge of the reporting requirement and intent to evade it are sufficient to meet the *mens rea* requirement.[2]

### 2. Sufficiency of the Evidence

All of the appellants, except Dorothy Brown, argue that the government did not produce sufficient evidence to convict them of the crimes charged. The government put forth only a theory and an unreliable witness, they argue, to portray them as criminals before the jury. The government responds that the circumstantial evidence indicated that the appellants attempted to conceal an illegal hoard of cash, and the testimony of Eric Maxwell provided direct evidence to that effect.

We review insufficiency of the evidence challenges by reviewing the evidence in the light most favorable to the government. *United States v. Funt*, 896 F.2d 1288, 1291 (11th Cir.1990) (citing *Hamling v. United*

**2.** *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) does not compel a different result. First, that case was decided within the unique context of Supreme Court precedent in criminal tax cases. —— U.S. at ———–——, 111 S.Ct. at 609–11, 112 L.Ed.2d at 628–30. Second, as discussed in the accompanying text, Congress manifested a definite intent in the legislative history of the anti-structuring statute to not require knowledge of the illegality of the prohibited act. Its intent to facilitate prosecution of money launderers, stands in direct contrast to the Supreme Court's holding in *Cheek* that Congress intended to show special deference to Tax Code violators, "due to the complexity of the tax laws." *Cheek*, —— U.S. at ———–——, 111 S.Ct. at 609–10, 112 L.Ed.2d at 628–29.

*States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). "Credibility choices and the weighing of evidence must be resolved in favor of the jury's verdict." *Funt,* 896 F.2d at 1291–92 (citing *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). If a reasonable jury could find that the defendants were guilty beyond a reasonable doubt, we must sustain the convictions. *See Funt,* 896 F.2d at 1292.

■ Appellants challenge their convictions under the conspiracy count (Carolyn, Richard, Rosa, and Shenita); the counts alleging filing of false CTRs (Carolyn and Rosa); and one of the counts alleging money structuring (Richard). With respect to the conspiracy charge, the government must have proven, beyond a reasonable doubt, that a conspiracy existed, that each appellant knew of the conspiracy, and that each appellant voluntarily joined in the conspiracy. *See United States v. Hernandez,* 896 F.2d 513, 518 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990). "Association with a coconspirator or presence at the scene of the crime is insufficient to prove participation in a conspiracy." *Hernandez,* 896 F.2d at 518; *see also United States v. Kelly,* 749 F.2d 1541, 1548–49 (11th Cir.), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985) (mere presence, without more, held insufficient to convict defendant of knowing participation in drug conspiracy). Thus, in this case, the government was required to prove beyond a reasonable doubt that a conspiracy existed to evade bank reporting requirements through money structuring.

With respect to the substantive charge of filing false currency transaction reports, the government was required to prove that Carolyn and Rosa Brown "willfully" "cause[d] or attempt[ed] to cause a domestic financial institution to file a [CTR] that contain[ed] a material omission or misstatement of fact." 31 U.S.C. § 5322(a); 31 U.S.C. § 5324(2). With respect to the challenged money-structuring charge, the government was required to prove that Richard Brown "willfully" structured cur-

rency transactions with the intent of evading the bank reporting requirements at 31 U.S.C. § 5313(a). 31 U.S.C. § 5322(a); 31 U.S.C. § 5324(3).

*Carolyn Brown*

■ The evidence was sufficient for the jury to find that Carolyn Brown knowingly participated in the conspiracy and that she willfully caused C & S Bank to file a false CTR. The jury could reasonably believe the government's evidence showing the existence of a conspiracy to conceal a hoard of currency. Carolyn Brown's knowing participation in the conspiracy was evidenced by her active involvement in numerous events, particularly the counting of over $30,000 in cash from a brown paper bag, her assistance in Eric Maxwell's purchase of cashier's checks, and her false listing of Maxwell as the owner of the funds on the CTR. The jury could also reasonably find Carolyn Brown guilty beyond a reasonable doubt of the substantive crime of willfully causing C & S Bank to file a false CTR. Her role in counting out the money supported the inference that she knew the funds did not belong to Maxwell, and thus that she willfully helped him cause the bank to file a false CTR. Although Carolyn Brown does not challenge her conviction on the substantive money structuring count, her active participation in the First Union Bank transaction similarly indicates her knowing involvement in the conspiracy.

*Rosa Brown*

■ The evidence was also sufficient for the jury to find Rosa Brown guilty of knowing participation in the conspiracy and of the substantive offense of causing Carver State Bank to file a false CTR. Maxwell testified that Rosa Brown assisted Carolyn Brown in counting out the $30,000 in cash at Rosa Brown's home. She also drove with Carolyn Brown and Maxwell to C & S Bank to purchase the cashier's checks. Although Rosa Brown produced a witness who testified that she was not present in the car or at C & S Bank, the jury was entitled to believe Maxwell's testimony to the contrary. In addition, Rosa

Brown's purchase of a $10,000 cashier's check at Carver State Bank, listing Eric Maxwell on the CTR as the owner of the funds, further supported the jury's finding that she knowingly participated in the conspiracy.

The jury could also find on these facts that Rosa Brown committed the substantive crime of causing Carver State Bank to file a false CTR. Maxwell testified that he did not give Rosa Brown the $10,000 she used to purchase the cashier's check. From that fact and the other evidence presented, the jury could infer that she lied when she listed Eric Maxwell as the owner of the funds on the CTR, thus "willfully" causing the bank to file a CTR containing a "material ... misstatement of fact." 31 U.S.C. § 5324(2).

### Shenita Jackson Brown

■ The government produced only two facts to support its charge that Shenita Jackson Brown knowingly participated in the conspiracy. First, she purchased a cashier's check for $2,205 at C & S Bank on April 22, 1988, listing Eric Maxwell as the remitter of the funds. Second, Eric Maxwell testified that Shenita Brown was present when Carolyn and Rosa Brown counted out the cash in the paper bag. This evidence is insufficient to support the jury's verdict that Shenita Brown knowingly participated in the conspiracy.

The government produced no evidence that Shenita Brown knew of the conspiracy to illegally conceal a hoard of cash. She was not present at the home closing, not present at any of the bank transactions that gave rise to the substantive charges in the indictment, and not present during any of the trips to Eric Maxwell's home in South Carolina. Although the prosecutor repeatedly implied that Shenita Brown purchased the $2,205 cashier's check as part of the money-structuring scheme, the government produced no evidence to that effect. On the contrary, the government's own witness testified that the cashier's check was drawn for $2,205 and made payable to Dot Owens Realty because that was the precise amount of the real estate broker's commission. When a person conducts cash trans-

actions in amounts of less than $10,000 because he or she has a legitimate reason to do so, no conspiracy to structure occurs. *See* Senate Report at 22.

■ Even if Shenita Brown lied when she listed Eric Maxwell as the remitter on the cashier's check, this fact would not prove that she was aware of a conspiracy to conceal a much larger hoard of illegal cash. The government may not rest upon proof that Shenita Brown acted in a way that happened to further the goals of the conspiracy. It had to show that she intended her acts to further the goals of the conspiracy. This it has simply failed to do.

■ Shenita Brown's presence at Rosa Brown's home is similarly insufficient to show participation in the conspiracy. Maxwell testified only that Shenita Brown was present, not that she helped count the money, that she participated in any way, or that she accompanied Maxwell into C & S Bank when the false CTR was filed. The evidence produced by the government shows only that Shenita Brown was visiting her sister-in-law. Mere presence, especially in the home of a family member where the person has every right to be, is insufficient to support a finding of knowing participation in a conspiracy. *See Hernandez*, 896 F.2d at 518; *Kelly*, 749 F.2d at 1548–49.

### Richard Brown

■ We hold that the evidence was also insufficient to support the conviction of Richard Brown on either the conspiracy charge or the substantive money-structuring charge. As with Shenita Brown, the evidence produced to support the conviction is sparse. Richard Brown inquired about purchasing various properties around Savannah; he stopped by briefly during the closing on Dorothy Brown's new home, and a bank employee overheard his name in a whispered conversation between Dorothy and Carolyn Brown at First Union Bank. With respect to the real estate inquiries, the government failed to prove any connection between those inquiries and the conspiracy charged. The lack of evidence establishing such a connection is underscored

by comparison to the evidence implicating the other defendants. For example, the government showed a direct tie between Dorothy Brown's purchase of a home and the filing of false CTRs. Similarly, it showed a connection between Dorothy Brown's subsequent mortgaging of that home and the structuring of the First Union Bank account withdrawals. In contrast, it showed no such connection between the unconsummated real estate deals in which Richard Brown was involved and the conspiracy for which he was charged.

Similarly, the overheard mention of Richard Brown's name at First Union Bank was insufficient to tie him to the conspiracy or to the substantive crime of money structuring. The bank employee overheard Carolyn or Dorothy Brown say, "Richard doesn't want it that way." On its face, the statement is inherently ambiguous, indicating neither that Richard Brown wanted the transaction structured nor that he wanted the money withdrawn in one lump sum. In context, however, the government's own witness testified that he understood the statement to mean Richard Brown wanted the money withdrawn in one lump sum. Thus, to the extent the statement proved anything, it showed that Richard Brown did not want the transaction to be structured. Richard Brown cannot be convicted of either conspiracy or money structuring when his only involvement was to advise Dorothy and Carolyn Brown not to structure the transaction. Finally, Richard Brown's mere presence at his mother's home closing, like Shenita Brown's presence at her sister-in-law's home, does not show knowing participation in the conspiracy.

The government clearly viewed Richard Brown as the ringleader of this conspiracy. Nonetheless, it produced no substantial evidence to that effect. In the absence of such evidence, it could not rely upon a theory alone to convict him of the crimes charged in this case.

### 3. Recall of Eric Maxwell

█ The district court did not abuse its discretion in allowing the government to recall Eric Maxwell as a witness on the second day of trial. Federal district courts retain broad discretion over the mode and order of interrogating witnesses and presenting evidence. Fed.R.Evid. 611(a). The district court made a reasoned determination that Maxwell's further testimony was material to ascertainment of the truth, and thus helpful to the jury. The court gave appellants' counsel an adequate opportunity to cross-examine Maxwell following his recall, and counsel properly used that opportunity to impeach Maxwell's credibility. Thus, the court preserved an adequate balance between ascertainment of the truth and fairness to the appellants.

### 4. Dorothy Brown's Incriminating Statements

█ Dorothy Brown argues that the government failed to respond to her pretrial discovery request for "any oral statements made by defendant Brown." She argues that she was unfairly surprised when the government subsequently introduced evidence at trial of incriminating statements she made to the IRS during its investigation of the case. Dorothy Brown did not object to the admission of the incriminating statements at trial.

We find no error, plain or otherwise, in the district court's decision to admit the statements. Throughout the discovery period, the government maintained an open case file. Dorothy Brown's counsel executed a certificate of disclosure, certifying that the government had made available its complete file in the case. Even if such constructive notice were not enough, the facts indicate that Dorothy Brown had actual notice of the incriminating statements in the prosecutor's file. For example, she did not move to compel compliance with her discovery request, indicating, as the government contends, that the government responded to the request by orally informing her that the statements were already available. *See* Fed.R.Crim.P. 16(d)(2). Dorothy Brown's failure to object to admission of the statements at trial or at the *Jackson–Denno* hearing further indicates that she was not surprised by the govern-

ment's proffer. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

### 5. Dorothy Brown's Ineffective Assistance of Counsel Claim

Dorothy Brown argues that her trial counsel was ineffective. In this circuit, "a claim of ineffective assistance of counsel may not be raised on direct appeal where the claim has not been heard by the district court nor a factual record developed." *United States v. Khoury*, 901 F.2d 948, 969 (11th Cir.1990). Dorothy Brown failed to raise the ineffective assistance claim in the district court, and the record before us is not sufficient to determine the issue. The ineffective assistance of counsel claim may be brought in the district court on collateral attack, which would then give this court "an order and a record to review." *United States v. Arango*, 853 F.2d 818, 823 (11th Cir.1988). As presented, the issue is not properly before this court.

### 6. Prosecutor's Closing Argument

Richard Brown argues that he was substantially prejudiced and deprived of a fair trial by the Assistant U.S. Attorney's mischaracterization of evidence in his closing arguments. Because we decide that Richard Brown's conviction should be reversed for insufficiency of the evidence, we need not determine whether the prosecutor's misconduct constituted reversible error.

### CONCLUSION

For the foregoing reasons, we affirm the convictions of Carolyn Brown, Dorothy Brown, and Rosa Brown. We reverse the convictions of Richard Brown and Shenita Jackson Brown for insufficiency of the evidence.

AFFIRMED in part and REVERSED in part.