**UNITED STATES of America, Appellee,**

v.

**Stanley CAMING, Defendant–Appellant.**

**No. 1569, Docket 92–1043.**

United States Court of Appeals, Second Circuit.

Argued May 19, 1992.

Decided June 29, 1992.

David A. Cutner, New York City (Clifford A. Rathkopf, Jr. and Debra I. Harris,

**234**

of counsel), for defendant-appellant Stanley Caming.

Robert E. Rice, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., Bruce G. Ohr and Michele Hirshman, Asst. U.S. Attys., of counsel), for appellee U.S.

Before: PRATT, FRIEDMAN,* and ALTIMARI, Circuit Judges.

FRIEDMAN, Circuit Judge:

In this appeal from his conviction for structuring currency transactions, the appellant contends that the district court erroneously (1) denied his pretrial motion to suppress evidence, (2) denied him a fair trial through certain evidentiary rulings, (3) instructed the jury concerning an element of the offense, and (4) calculated his sentence under the Sentencing Guidelines. We reject all these contentions and affirm the conviction and sentence.

### I

After a jury trial in the United States District Court for the Southern District of New York, the appellant Caming was convicted (on two counts) of (1) structuring currency transactions to avoid currency transaction reports, in violation of 31 U.S.C. §§ 5322(b) and 5324(3), and (2) causing and attempting to cause financial institutions to fail to file currency transaction reports in violation of 31 U.S.C. §§ 5322(b) and 5324(1). He was sentenced to 24 months in prison, followed by two years of supervised release, and the mandatory $100 assessment was imposed.

The evidence supporting the jury verdict, the sufficiency of which is not challenged, shows that over a 16–month period Caming structured more than $700,000 in cash transactions to avoid the requirement of 31 U.S.C. § 5313(a) that financial institutions report all currency transactions of more than $10,000. During that period, he made more than eighty separate cash deposits, totalling $675,000, into nine accounts he opened in real or fictitious names at six banks in New York City. Caming used false Social Security numbers for these fictitious accounts and opened a post office box, to which he held the key, in one of those fictitious names.

All of these deposits were for less than $10,000, but frequently for more than $9,000. On occasion Caming made multiple deposits, each for less than $10,000, but which totalled more than $10,000, on the same day. During this period, he also made five withdrawals from these accounts, each for between $9,000 and $10,000.

The government's proof included numerous financial records, bank deposit slips and other bank records, and testimony. A teller and a bank manager testified that Caming attempted on one occasion simultaneously to make two cash deposits that together amounted to more than $10,000, and that he left without making the deposits when he was told that the bank would have to file a currency transaction report based on the transactions. Two bank managers testified that signs informing bank customers of the $10,000 currency transaction reporting requirement and the criminal penalties for structuring a transaction to avoid those requirements were displayed at the branch during the period when Caming was depositing funds into the accounts. These witnesses further testified that a sign that Caming was looking at in two bank surveillance photographs was such a sign. The government also introduced bank surveillance photographs of Caming conducting transactions at a particular bank, the dates and times of which coincided with the dates and times that he made deposits into several accounts there.

### II

■ Caming contends that the district court improperly denied his pretrial motion to suppress evidence seized from his automobile upon and shortly following his ar-

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

rest while driving. According to Caming, the government delayed arresting him to enable it to seize evidence from his automobile. The district court correctly rejected this contention. Although Caming requested an evidentiary hearing on his motion to suppress, the district court denied the request because the court found that "the material facts are not in dispute."

A. The facts relating to Caming's arrest, as set forth in uncontradicted affidavits of Stephen D. Pinzino, the Internal Revenue Service agent in charge of the investigation, and of Caming, are as follows:

On Friday afternoon, Pinzino obtained a warrant to arrest Caming. At approximately 5:00 a.m., the following Monday, Pinzino and three other agents of the Internal Revenue Service stationed themselves outside of the apartment building in Manhattan where Caming lived. The agents decided to try to arrest him when he left the building. They made that decision because (1) the agents were unfamiliar with Caming's apartment, (2) it is safer to make an arrest in an open area than in an apartment and (3) during their surveillance of Caming, they had observed his wife, "who appeared frail and not in good health" and who they believed "would have had great difficulty watching her husband's arrest."

After waiting approximately three-and-a-half hours, during which Caming did not appear, the agents checked the garage in the building and discovered that his car was not there. The agents then proceeded to an athletic club in Brooklyn, where they had surveilled him "on numerous occasions," and saw his car in the club's parking lot. The district court noted that, according to an affidavit by Caming's counsel, the club's owner "was also a target of the investigation."

Since the use of the parking lot was limited to club members, "in order to avoid detection and not arouse suspicion," the agents, in two automobiles, "staked out positions on side streets outside the club." When Caming drove out of the parking lot, the agents "pulled our cars out" and

blocked Caming's car approximately 100 feet from the parking lot exit.

The agents ordered Caming out of the car and arrested him. A search of the automobile disclosed various financial documents, business records and other items, located on the front seat, in the glove compartment, and inside the driver's sun visor. The next day, during an inventory of the automobile, additional documents were discovered under the front passenger seat and in the trunk. The prosecution introduced some of these items into evidence.

B. In denying the motion to suppress, the district court, 756 F.Supp. 121, announced and applied the following legal standard:

> When a police officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the vehicle.... Where, however, it appears that the search and not the arrest was the real purpose in effecting a warrantless search of the premises, "and that the arrest was a pretext for or at most an incident of the search," the search is unreasonable under the Fourth Amendment. [Citations omitted.]

The court ruled that Caming

> presents no evidence that the Agents contrived to arrest defendant in his car so as to conduct a pretextual warrantless search of the vehicle. Here, the Agents surveilled defendant's Manhattan apartment building for three and one-half hours, from 5:00 a.m. to 8:30 a.m., in an attempt to arrest defendant as he exited the building. Only when this attempt proved unsuccessful did the Agents search for defendant elsewhere. [Footnote omitted.]

The court stated that "the record indicates no improper purpose" in the agents having "waited for defendant to enter his car and begin to drive away" from the athletic club. "Special Agent Pinzino stated that the agents' motivation was 'to avoid detection and not arouse suspicion.'"

The court then stated

In light of the circumstances of the arrest, which occurred between 10:00 a.m. and 10:30 a.m. on a business day, and defendant's statement that the Club's parking lot holds "about 150 cars," Caming Aff. ¶ 3, Special Agent Pinzino's explanation is entirely credible. Common sense dictates that on a morning during the work-week, a tennis club parking lot is not apt to be full since the majority of patrons would normally be engaged in their regular employment; more likely, such a lot would be closer to empty. The Court accordingly finds that since Arnold Marshel, the Club's owner, was apparently a target of the investigation, the Special Agents' decision not to stake out positions within the Club's parking lot, where their presence would likely be conspicuous, and to arrest defendant as he exited the Club's parking lot, indicates nothing more than Agents' sound exercise of judgment in the execution of an arrest warrant.

The record fails to suggest that the Agents, by deliberately waiting to arrest defendant as he exited the Club, improperly manipulated the situation in order to conduct a search of defendant's vehicle.

C. We agree with the district court that Caming has not shown that his arrest was a pretext to enable the agents to search his car. As the district court noted, the agents originally intended to arrest Caming when he left his apartment house. It was only after waiting three-and-a-half hours that they discovered his car was not in the apartment house garage. The agents' decision not to wait for him in the club's parking lot where, at that time of day, they would have been conspicuous and could have alerted the club owner, who apparently was also under investigation, was reasonable. The agents quickly stopped Caming's car as soon as it had left the parking lot and immediately executed the arrest warrant.

Indeed, if the agents' purpose in arresting Caming had been to seek evidence, presumably they would have arrested him earlier in the morning at his apartment. That was a much more likely place for him to have kept records relating to his currency structuring activities than the glove compartment, seat, or visor of his automobile.

The affidavits Caming submitted in opposition to agent Pinzino's detailed affidavit did not create a dispute over any material fact that required the district court to hold a hearing before denying the motion to suppress. The defense affidavits did not deny or refute the allegations in Pinzino's affidavit and, as we hold, those allegations refuted Caming's claim that the arrest was a pretext for searching the car for evidence. Moreover, the factual issues which, according to Caming's brief in this court, he raised in the district court, the resolution of which he contends required a hearing—such as "[w]hether the agents anticipated arresting defendant in his car pursuant to the arrest warrant they had obtained," and "whether the agents had an opportunity to apply for a search warrant prior to the arrest and search—" were irrelevant to the question the district court decided: that the arrest was not pretextual.

### III

Caming contends that the district court violated his Sixth Amendment rights and thereby denied him a fair trial by improperly limiting the cross-examination of two witnesses and quashing a subpoena to a third witness.

■ A. Agent Pinzino was a major government witness. Caming cross-examined him vigorously and extensively regarding all aspects of his investigation of Caming. The district court, however, sustained an objection to questions regarding Pinzino's private law practice.

At a side bar conference, Caming's counsel stated: "I have information that Mr. Pinzino has a private law practice and has represented clients in criminal cases and that some of his actions in that regard might be in violation of his responsibilities as an Internal Revenue agent, and, further, may place him in conflict of interest with his duties as agent. If that is so, the jury is entitled to know." He asserted that

these issues related to Pinzino's credibility. The prosecutor stated that: "Pinzino is in conformity with all IRS regulations and all of his outside legal activities have been specifically authorized by the Internal Revenue Service." Caming's counsel stated that Pinzino did not represent "anyone involved in this case in any way." The district court adhered to its sustaining of the objection.

The district court permitted Caming to ask Pinzino: "did you ever receive any awards or commendations in connection with your performance in this case?" The court sustained an objection to the question: "Mr. Pinzino, one of the results of your investigation was that you were able to seize more than $600,000 of Mr. Caming's money, is that right?", struck the question from the record and told the jury to disregard it.

"[T]he scope and extent of cross-examination are generally within the sound discretion of the trial court." *United States v. Pedroza,* 750 F.2d 187, 195 (2d Cir.1984). "The decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused." *United States v. Maldonado–Rivera,* 922 F.2d 934, 956 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata,* 916 F.2d 795, 806 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991) (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980)).

The district court did not abuse its discretion in barring cross-examination of Pinzino on these two issues. The court permitted extensive cross-examination of the witness and Caming's challenges to Pinzino's credibility were thoroughly developed. The additional points on which Caming sought to cross-examine were of marginal relevance, at best, and their exclusion did not prejudice Caming's defense or deny him a fair trial.

■ B. Carter, an assistant branch manager for the Bank of New York branch where Caming made the majority of his deposits, testified about a conversation that he had with Caming and his own investigation of some of Caming's structured deposits. He also testified that three signs warning customers of the structuring laws were posted at the branch, and that one such sign was shown in a surveillance photograph that depicted Caming looking at the sign.

The defense extensively cross-examined Carter. This included questions concerning Carter's meetings with the prosecutors, the fact that Carter had been instructed by his superiors to cooperate with the prosecutors on the case, and whether Carter spoke with the Bank's lawyers following his direct testimony.

The court sustained objections to two defense questions: whether Carter had been "instructed by someone at the bank that you should not agree to be interviewed by defense?", and whether he "underst[oo]d that you were not to cooperate in any way with the defense?" Caming contends that those questions were proper to show Carter's alleged bias against Caming.

The district court did not abuse its discretion in barring those questions. If someone at the bank had told Carter not to be interviewed by defense counsel or indicated that he should not cooperate with the defense, that would hardly show that Carter was biased against Caming. Moreover, Carter already had been questioned whether he had been instructed to cooperate with the prosecution, whether he had spoken with the prosecution before his testimony, and whether he had spoken to the bank's lawyers after his direct testimony. Despite the denial of cross-examination on the two points, the jury still was "in possession of facts sufficient to make a 'discriminating appraisal' of Carter's credibility." *Roldan–Zapata,* 916 F.2d at 806. There was no improper curtailment of the cross-examination of Carter.

C. Caming subpoenaed Ann Schwab, a lawyer for the Bank of New York, who represented the bank employees whom the government and the defense had subpoenaed—apparently to question her about the bank's alleged bias against Caming and the signs posted in the bank's branch office. After Ms. Schwab told the court that she "know[s] nothing about the underlying transactions," had "no personal knowledge of any of the underlying facts" and "can't testify to the bank's procedures because I don't know them myself," the court quashed the subpoena.

■ The district court did not abuse its discretion in doing so. Determinations of relevance and materiality are entrusted to the sound discretion of the trial judge. *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir.1986); *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). "Because the trial judge is in a superior position to evaluate the likely impact of the evidence, since he sees the witnesses, the parties, the jurors, and the attorneys, and their mannerisms and reactions, [this court] will not overturn his evidentiary rulings unless he acted arbitrarily or irrationally." *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).

Caming's allegations that he wished further to explore the Bank's alleged bias by calling the Bank's lawyer fall far short of showing that " 'there is a reasonable likelihood that [Schwab's] testimony could have affected the judgment of the trier of fact.' " *United States v. Champegnie*, 925 F.2d 54, 56 (2d Cir.1991) (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 873–74, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982)). That was the only ground on which Caming originally sought to subpoena Ms. Schwab. Although he subsequently indicated that he wanted to question her about the signs in the bank, she had stated that she could not testify about "the bank's procedures because I don't know them myself." The quashing of the subpoena to

Ms. Schwab did not deny Caming a fair trial.

## IV

■ Under 31 U.S.C. § 5313(a) (1988) and the implementing regulations (31 C.F.R. § 103.22(a)(1) (1991)), banks are required to report all currency transactions involving more than $10,000. Section 5324 of Title 31 provides that:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
>
> * * * * * *
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

A person who "willfully violat[es]" this provision commits a crime. 31 U.S.C. § 5322 (1988).

In *United States v. Scanio*, 900 F.2d 485 (2d Cir.1990), this court rejected the contention that "in order to impose criminal liability for structuring a currency transaction, the government was required to show that [the defendant] was actually aware that structuring is illegal." *Id.* at 486. It ruled: "By its plain language, § 5324(3) is violated when an individual structures a currency transaction with the intent to evade § 5313's reporting requirements." *Id.* at 489. "[A] criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring is unlawful...." *Id.* at 491.

The court distinguished its prior cases holding that the crime of willfully transporting more than $10,000 in monetary instruments into or out of the United States without having filed certain reports (31 U.S.C. § 5316) requires "both the defendant's actual or probable knowledge of the reporting requirement and the defendant's intention to commit the crime," *id.* at 489, on the following grounds:

> The requirement that a defendant be actually or probably aware of a reporting obligation before liability may attach for failure to file stems from the view that

"[t]he primary purpose of law, and the criminal law in particular, is to conform conduct to the norms expressed in that law. When there is no knowledge of the law's provisions, and no reasonable probability that knowledge might be obtained, no useful end is served by prosecuting the 'violators.'" *United States v. Mancuso,* 420 F.2d 556, 559 (2d Cir.1970).

\* \* \* \* \* \*

In the present case, however, Scanio was not prosecuted for having failed to comply with an obscure reporting requirement; he was charged with having intentionally structured a currency transaction with the explicit purpose of evading what he knew to be the bank's legal duty to file CTRs for all transactions exceeding $10,000. Scanio engaged in affirmative conduct and demonstrated an awareness of the legal framework relative to currency transactions which, it is reasonable to conclude, should have alerted him to the consequences of his conduct.

\* \* \* \* \* \*

[U]nlike § 5316 which requires individuals to report otherwise innocent transactions, § 5324(3) prohibits purposeful conduct aimed at defeating the government's right to information. Where a defendant is charged with violating an obscure reporting provision, proof that (s)he was specifically aware of the reporting provision is necessary to establish criminal intent. With respect to a prosecution for structuring, however, the requirement that a defendant be shown to have acted with a "bad purpose" is satisfied by proof that (s)he (1) knew that the bank was legally obligated to report currency transactions exceeding $10,000 and (2) intended to deprive the government of information to which it is entitled.

*Id.* at 490–91.

The court further held that its ruling that "a criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring is unlawful effectuates Congress's clear intent as is shown by the legislative history surrounding the anti-structuring provision.... With respect to the applicable *mens rea,* the legislative history indicates that Congress only intended to require proof that the defendant structured a currency transaction in order to prevent the financial institution from filing a CTR.... In light of this legislative history, we decline Scanio's invitation that we impose, as an additional constraint upon the use of § 5324(3), the requirement that the government prove that the defendant had actual knowledge that structuring is unlawful." *Id.* at 491.

Since *Scanio,* at least four other circuits have agreed with and followed that decision. *United States v. Rogers,* 962 F.2d 342, 344–45 (4th Cir.1992); *United States v. Brown,* 954 F.2d 1563, 1568 (11th Cir. 1992); *United States v. Dashney,* 937 F.2d 532, 538–39 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991); *United States v. Hoyland,* 914 F.2d 1125, 1129 (9th Cir.1990).

The district court charged the jury in accordance with *Scanio.* It refused to give Caming's requested additional charge that the government also was required to prove "[t]hat the defendant knew that his structuring of these currency transactions was unlawful." The court instructed that "you do not need to find that the defendant knew that structuring was unlawful in order to find that he acted knowingly and willfully for the purposes of this element."

A. Caming argues that *Scanio* was decided incorrectly and urges us to reconsider and reverse it. The arguments he makes, however, basically are those that the court considered and rejected in *Scanio. Scanio* was a detailed opinion that carefully and convincingly addressed the issue. We are not disposed to reconsider that recent decision, which several courts of appeals have followed. See particularly *Dashney,* 937 F.2d at 537–539, where the 10th Circuit in following *Scanio* discussed the legislative history of the currency structuring statute in greater detail than we did in *Scanio,* but was "not persuaded that the legislative history as a whole impels a construction of the statutes in the restrictive manner which Dashney suggests." *Id.* at 538.

B. Caming urges, however, that the Supreme Court decision in *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), rendered after *Scanio*, so undermines *Scanio* as to require its reconsideration.

*Cheek* involved criminal convictions for willfully failing to file federal income tax returns and willfully attempting to evade income taxes. Cheek was a tax protester and his defense was that he "sincerely believed that the tax laws were being unconstitutionally enforced and that his actions during the 1980–1986 period were lawful. He therefore argued that he had acted without the willfulness required for conviction of the various offenses with which he was charged." *Id.* at 607.

The district court instructed the jury that " '[a]n honest but unreasonable belief is not a defense and does not negate willfulness,' " and that " '[a]dvice or research resulting in the conclusion that wages of a privately employed person are not income or that the tax laws are unconstitutional is not objectively reasonable and cannot serve as the basis for a good faith misunderstanding of the law defense.' " *Id.* at 608. The court of appeals for the seventh circuit affirmed the conviction, agreeing with the district court that "only an objectively reasonable misunderstanding of the law negates the statutory willfulness requirement." *Id.* at 608.

The Supreme Court reversed. It held that the instruction improperly interpreted the willfulness element of the criminal tax provisions involved by imposing the requirement that a defendant's belief must not only be honest, but objectively reasonable.

The Court pointed out that almost 60 years ago, it had "interpreted the statutory term 'willfully' as used in the federal criminal tax statutes as carving out an exception to the traditional rule" that "ignorance of the law or a mistake of law is no defense to criminal prosecution." *Id.* at 609. It explained that "special treatment of criminal tax offenses is largely due to the complexity of the tax laws." *Id.* at 609. The Court stated that its prior decisions "conclusively

establish that the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.' " *Id.* at 610.

Caming apparently reads *Cheek* broadly as holding that in crimes involving willfulness, the government is required to prove that the defendant was aware of the illegality of his actions. · *Cheek* announced no such broad principle. The opinion deals with the meaning of willfulness in federal criminal tax cases; no less than five times is the discussion specifically related to such cases.

Three courts of appeals have held *Cheek* inapplicable to the currency structuring offense here involved and have refused to read *Cheek* as undermining the *Scanio* holding that willfulness under the currency structuring law is established by proof that the defendant was aware of the financial institution's obligation to report currency transactions of more than $10,000 and does not require the government also to show that the defendant knew that structuring is illegal. *United States v. Dashney*, 937 F.2d at 540; *United States v. Brown*, 954 F.2d at 1569 n. 2.; *United States v. Rogers*, 962 F.2d at 344. In *Dashney*, the 10th circuit stated:

> Dashney argues that the complexity of the statutes governing the reporting of monetary transactions is equal to that of the tax statutes and, thus, a similar exception to the general rule should be made in interpreting these reporting statutes. We disagree. *Cheek* involves only certain criminal tax statutes, and we see no reason to extend similar statutory interpretation into the straightforward currency reporting requirements.

937 F.2d at 540.

Other circuits also have repeatedly refused to apply *Cheek* to the willfulness element of non-tax criminal statutes. *See, e.g., United States v. Chaney*, 964 F.2d 437, 453–54 (5th Cir.1992) (making false statements on bank records); *United States v. Gay*, 967 F.2d 322 (9th Cir.1992) (mail and property fraud); *United States v. Donovan*, No. 91–1574, 1992 WL 18217, at *3, 1992 U.S.App. LEXIS 1535, at *4 (1st

Cir. Feb. 6, 1992) (violation of currency transaction reporting requirements by bank officer).

In sum, like the fourth, tenth, and eleventh circuits, we decline to read *Cheek* as undermining our holding in *Scanio*.

## V

Finally, Caming challenges the correctness of his sentence under the Sentencing Guidelines on two grounds.

■ A. In calculating Caming's sentence, the district court determined that under the Guidelines, Caming's base level was 13. Caming contends that his base level should have been 5.

Section 2S1.3 of the Guidelines provides:
(a) Base Offense Level:
  (1) 13, if the defendant:
    (A) structured transactions to evade reporting requirements; or
    (B) made false statements to conceal or disguise the evasion of reporting requirements; or
    (C) reasonably should have believed that the funds were criminally derived property;
  (2) 5, otherwise.
The Commentary to this section states:

A base offense level of 13 is provided for those offenses where the defendant either structured the transaction to evade reporting requirements, made false statements to conceal or disguise his activity, or reasonably should have believed that the funds were criminally derived property. A lower alternative base offense level of 5 is provided in all other cases. The Commission anticipates that such cases will involve simple recordkeeping or other more minor technical violations of the regulatory scheme governing certain monetary transactions committed by defendants who reasonably believe that the funds at issue emanated from legitimate sources.

Caming contends that level 13 was intended to cover only those currency structuring transactions that involve illegally derived funds, and that level 5 is the proper level when there is no evidence that the funds involved were so derived. Caming is incorrect.

Guidelines Section 2S1.3 provides for a base offense level of 13 if the defendant "structured transactions to evade reporting requirements." That is precisely what Caming was charged with and convicted of in this case. The language of the Guideline is broad and unqualified and does not support the limitation that Caming would impose upon it.

The Commentary that level 13 covers an offense where the defendant "reasonably should have believed that the funds were criminally derived property" provides an alternative basis for a level 13 base offense. It is not a condition to the first situation in which the commentary prescribes level 13: "where the defendant either structured the transaction to evade reporting requirements."

Caming's offense in this case involved the structuring of more than $700,000 in more than 80 cash transactions. It is a far cry from the type of case to which the commission anticipated level 5 would apply: "simple recordkeeping or other more minor technical violations of the regulatory scheme governing certain monetary transactions committed by defendants who reasonably believe that the funds at issue emanated from legitimate sources." Indeed, there is no evidence in this record that Caming "reasonably believe[d] that the funds at issue emanated from legitimate sources."

The district court correctly determined that Caming's base offense level was 13.

■ B. Caming argues that the district court erroneously refused to make a downward departure from the Guidelines based on Caming's wife's medical condition and his ties to and responsibilities for her. In rejecting such a downward departure, the district court stated:

So far as a downward procedure based on the condition of the defendant's wife, I have heard about the defendant's wife prior to this. This is a longstanding situation. I am very sorry that that is the case, but I think the kind of conduct that

242

this man was involved in, I cannot consider a downward departure.

"A decision not to depart downward from the applicable Guidelines range is not appealable when the Guidelines provision was correctly applied and the sentence is not in violation of the law. An appeal may be heard, however, when a refusal to depart is based on a mistaken view that the Sentencing Commission precluded the departure in question." *United States v. Richardson,* 923 F.2d 13, 15 (2d Cir.1991) (citation omitted).

We do not read the district court's statement that "I think the kind of conduct that this man was involved in, I cannot consider a downward departure," as reflecting the view that the court lacked authority so to depart. Rather, we think the court concluded that, in view of the seriousness of Caming's offense, it would be inappropriate to depart in this case. Shortly before refusing to depart, the court, in holding that level 13, rather than level 5, was the proper base level for the offense, pointed out: "There was a tremendous amount of money involved here, $725,000 in cash deposits in over 100 separate transactions."

Accordingly, the district court's refusal to make a downward departure is not reviewable.

The judgment of the district court is *affirmed.*