USCA1 Opinion

 

 January 13, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 91-1363 UNITED STATES OF AMERICA, Appellee, v. DANIEL F. AVERSA, Defendant, Appellant. _________________________ No. 91-1364 UNITED STATES OF AMERICA, Appellee, v. VINCENT MENTO, Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Martin F. Loughlin, Senior U.S. District Judge] __________________________ _________________________ No. 91-1574 UNITED STATES OF AMERICA, Appellee, v. WILLIAM J. DONOVAN, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, U.S. District Judge] ___________________ _________________________ Before Breyer, Chief Judge, ___________ Coffin and Bownes, Senior Circuit Judges, _____________________ Torruella, Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Robert V. Johnson II, for appellant Aversa. ____________________ David A. Ross, with whom Eaton, Solms, McIninch & Phillips _____________ __________________________________ was on brief, for appellant Mento. Jonathan R. Saxe, with whom Twomey & Sisti Law Offices was ________________ ___________________________ on brief, for appellant Donovan. Peter E. Papps, First Assistant United States Attorney, with ______________ whom Jeffrey R. Howard, United States Attorney, and Richard A. __________________ __________ Friedman, Attorney, Department of Justice, were on brief, for the ________ United States. _________________________ _________________________ OPINIONS EN BANC _________________________ SELYA, Circuit Judge. The government charged each of SELYA, Circuit Judge. ______________ these appellants with criminal violations of the Bank Records and Foreign Transactions Act (BRFTA), Pub. L. No. 91-508, 84 Stat. 1114 (1970) (codified as amended in various sections of 12 U.S.C., 15 U.S.C., and 31 U.S.C.). Appellant Donovan was charged with, and convicted of, failure to file currency transaction reports (CTRs). See 31 U.S.C. 5313 (1988). Appellants Aversa ___ and Mento were charged with, and convicted of, structuring bank deposits to avoid triggering currency transaction reporting requirements. See 31 U.S.C. 5324 (1988). In each case, the ___ underlying legal requirement comprises part of Subchapter II of the BRFTA. Subchapter II's criminal penalty provision, 31 U.S.C. 5322(a), proscribes only "willful" violations of the subchapter's provisions. A panel of this court initially heard Donovan's appeal and decided it adversely to him. We subsequently withdrew the panel opinion and granted rehearing en banc, consolidating the appeal with appeals involving Aversa and Mento, so that we might settle the meaning of the term "willful" as used in Subchapter II.1 The en banc court now affirms Donovan's conviction while vacating the other convictions and remanding those cases for further proceedings. ____________________ 1The government filed cross-appeals challenging the relatively mild sentences imposed on Mento and Aversa. In view of our disposition of the issue before the en banc court, the cross-appeals (Nos. 91-1615 and 91-1616) are moot. They will, therefore, be dismissed without prejudice. 3 I. BACKGROUND I. BACKGROUND These cases originated in different ways and traveled different paths to reach our doorstep. We sketch the background and then frame the common issue that all three appeals present. A. Donovan. A. Donovan. __________ Donovan, the president and chief executive officer of Atlantic Trust Company, a Boston-based financial institution, moonlighted as a real estate developer. A friend, Dr. Edward Saba, gave Donovan substantial sums of cash to deposit at Atlantic Trust for eventual investment in a New Hampshire housing subdivision. Eschewing Atlantic Trust's standard protocol for routing deposits through tellers, Donovan personally deposited Saba's money in five chunks of $30,000, $92,000, $30,000, $55,000, and $30,000, respectively. Donovan made the deposits at various times between March 13, 1987 and April 21, 1987. Although Donovan was the bank's legal compliance officer a status which presumptively suggests his familiarity with banking laws he did not prepare CTRs for any of these deposits. Indeed, Donovan fended off his subordinates' concerns about the unorthodox way he was handling Saba's cash. At trial, Donovan admitted that he was aware of the law requiring him to file CTRs for cash deposits of $10,000 or more, but insisted that he mistakenly believed Saba's deposits came within one of the law's exemptions.2 The district court ____________________ 2"Deposits or withdrawals of currency from an existing account by an established depositor who . . . operates a retail type of business" are exempted from the reporting requirements 4 instructed the jury that it was the government's burden to prove Donovan "knowingly" and "willfully" failed to file CTRs. The court twice explained these elements (once during the main charge and once in answering an inquiry during jury deliberations): An act or a failure to act is knowingly done if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reason. An act or a failure to act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids, that is to say with bad purpose, either to disobey or disregard the law. Despite Donovan's importuning, the district court refused to tell the jury that any mistake by Donovan, regardless of its nature, would necessitate acquittal. The jury found Donovan guilty. B. Aversa and Mento. B. Aversa and Mento. ___________________ Aversa and Mento were partners in a real estate business. In January 1989, they sold a parcel of land, splitting the proceeds. At the time, Aversa's marriage was foundering. In order to conceal his share of the profits from his wife, Aversa asked Mento to deposit the receipts in Mento's personal bank account rather than in the partners' joint business account. Mento agreed. Aversa signed a statement acknowledging his responsibility for one-half of the funds to insulate Mento from potentially adverse tax consequences. Mento and Aversa knew that Mento's bank was legally required to file CTRs for all deposits of $10,000 or more. ____________________ under 31 C.F.R. 103.22(b)(2)(i) (1987). Donovan does not contend that Saba was an exempt customer under this, or any other, section of the regulations. 5 Fearing that the resultant paper trail might obviate their efforts to hide the cash from Mrs. Aversa, the defendants made serial deposits and withdrawals in sums under $10,000. Although both men admitted that they knew about the CTR requirement, they claimed to be unaware that structuring bank transactions, even if designed to avoid causing the bank to file CTRs, was itself a crime. Following the return of indictments, the government moved in limine to prevent the introduction of evidence __ ______ supporting the defendants' mistake-of-law theory. Judge Loughlin granted the motion. Aversa then pled guilty to structuring, but did so conditionally, see Fed. R. Crim. P. 11(a)(2), reserving ___ his mistake-of-law defense for appeal. Mento opted for trial. At the trial, the district court, over timely objection, instructed the jury that mistake of law was not a defense to structuring. The jury found Mento guilty. C. The En Banc Issue. C. The En Banc Issue. ____________________ Although these appellants breached different regulatory provisions of Subchapter II, each was convicted under the subchapter's criminal penalty provision, 31 U.S.C. 5322, and each raised a mistake-of-law defense. We convened the en banc court specifically to examine the efficacy of such defenses in the CTR and antistructuring contexts. At bottom, this task requires us to elucidate the state of mind that Congress required when it limited such violations to willful misconduct. II. DISCUSSION II. DISCUSSION 6 We begin with an analysis of the governing statute, exploring its interstices and explicating its meaning. We then proceed to tackle the knotty mens rea questions that confront us. ____ ___ A. The Statutory Scheme. A. The Statutory Scheme. _______________________ In 1970, concerned about the ease with which criminals, particularly drug traffickers, were able to exchange ill-gotten profits for "clean" money, Congress enacted the BRFTA. Among other things, Subchapter II delegated to the Secretary of the Treasury (the Secretary) the power to require banks and individuals to file CTRs with the Internal Revenue Service when cash changed hands.3 See, e.g., 31 U.S.C. 5313. The ___ ____ Secretary did not exercise his delegated power in respect to individuals, but required banks to file CTRs when transactions involved $10,000 or more. See 31 C.F.R. 103.22(a)(1) (1989). ___ Although Subchapter II's transaction report requirement expanded the armamentarium of federal law enforcement agents, it was too easily circumvented. Individuals who wished to avoid a paper trail for any reason could simply segment large sums of money into several transactions of less than $10,000. In an apparent effort to plug this loophole, Congress amended ____________________ 3Subchapter II has a number of other regulatory provisions, including reporting requirements for importing and exporting currency and for foreign currency transactions. See 31 U.S.C. ___ 5313-17. Congress did not require that an individual be guilty of some related infraction (say, drug trafficking) before he could run afoul of these currency regulations. Rather, Congress provided that individuals who violate the currency regulations while involved in some other criminal activity are eligible for harsher penalties than those who violate the currency regulations alone. Compare 31 U.S.C. 5322(a) with 31 U.S.C. 5322(b). _______ ____ 7 Subchapter II in 1986. Pub. L. No. 99-570, 100 Stat. 3207 (1986), codified at 31 U.S.C. 5324. The new antistructuring ________ __ provision limited an individual's ability to dodge the CTR requirement.4 At the time, Congress considered, but decided not to alter, section 5322's criminal provisions. Thus, section 5322, which criminalizes conduct undertaken by a "person willfully violating [subchapter II or a regulation promulgated under Subchapter II]," applies to the antistructuring section as well as to the balance of Subchapter II. Although appellants stand convicted of different offenses Donovan was found guilty ____________________ 4The amendment read in pertinent part: No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction -- . . . (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions. 31 U.S.C. 5324. The regulations implementing the statute explained that: a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements . . . . "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. 31 C.F.R. 103.11(n) (1989). 8 of violating the CTR provision while the other two appellants were convicted of structuring infractions they all argue that section 5322's willfulness requirement means that, to be found guilty, they must have intentionally traversed a known legal duty. Consequently, they press a subjective standard of intent and asseverate that mistake of law necessarily constitutes a complete defense to the charges laid against them. The government takes a diametrically opposite view. It contends that, because Congress made no express provision to the contrary, ignorance of the law cannot serve as a defense to the instant charges. See generally United States v. Dotterweich, 320 ___ _________ _____________ ___________ U.S. 277, 284 (1943) (holding that consciousness of wrongdoing is not necessary for conviction). The government's position derives some support from an array of appellate cases which have disallowed mistake-of-law defenses in the transactional structuring milieu. See, e.g., United States v. Ratzlaf, 976 ___ ____ _____________ _______ F.2d 1280, 1283 (9th Cir. 1992); United States v. Caming, 968 _____________ ______ F.2d 232, 238-39 (2d Cir.), cert. denied, 113 S. Ct. 416 (1992); _____ ______ United States v. Gibbons, 968 F.2d 639, 644 (8th Cir. 1992); ______________ _______ United States v. Rogers, 962 F.2d 342, 344 (4th Cir. 1992); ______________ ______ United States v. Brown, 954 F.2d 1563, 1568 (11th Cir.), cert. ______________ _____ _____ denied, 113 S. Ct. 284 (1992); United States v. Dashney, 937 F.2d ______ _____________ _______ 532, 538 (10th Cir.), cert. denied, 112 S. Ct. 402 (1991); United _____ ______ ______ States v. Scanio, 900 F.2d 485, 490 (2d Cir. 1990). For the ______ ______ reasons discussed below, we think these cases read section 5322 in an overly malleable manner. 9 B. Mens Rea: CTR Violations. B. Mens Rea: CTR Violations. ____________________________ We start by analyzing the mens rea required with ____ ___ respect to CTR violations. Under the criminal penalty provision, 31 U.S.C. 5322, violations, to be culpable, must be "willful." The Court has long recognized that willful "is a word of many meanings, its construction often being influenced by its context." Spies v. United States, 317 U.S. 492, 497 (1943). See _____ _____________ ___ generally Note, An Analysis of the Term "Willful" in Federal _________ ________________________________________________ Criminal Statutes, 51 Notre Dame L. Rev. 786, 786-87 (1976). _________________ Courts have coalesced around four definitions of willfulness. The first, which is most closely aligned with the government's theory here, simply equates "willful" with "knowing" (i.e., so long as the defendant is aware of his conduct and the ____ nature of his circumstances, no more is necessary). See, e.g., ___ ____ United States v. McCalvin, 608 F.2d 1167, 1171 (8th Cir. 1979); _____________ ________ see also American Law Institute, Model Penal Code 2.02(8) ___ ____ _________________ (1985).5 The second definition of willfulness, which is most ____________________ 5An exchange between Judge Learned Hand and the reporter for the Model Penal Code, Professor Herbert Wechsler, indicates that the Code's principal architects thought that the term "willfully" added very little to statutory meaning: Judge Hand: [Willfully is] an awful word! Judge Hand It is one of the most troublesome words in a statute that I know. If I were to have the index purged, "wilful" would lead all the rest in spite of its being at the end of the alphabet. Professor Wechsler: I agree with you Judge Professor Wechsler Hand, and I promise you unequivocally that the word will never be used in the definition of any offense in the Code. But because it is such a dreadful word and so common in the 10 closely aligned with appellants' position, has its roots in tax- crime cases. This approach equates willfulness with the violation of a known legal duty. See, e.g., Cheek v. United ___ ____ _____ ______ States, 111 S. Ct. 604, 610 (1991) (discussed infra Part II(D)). ______ _____ To our knowledge, no court of appeals has applied either of these first two definitions across the board in connection with the entire array of Subchapter II violations. Several courts, however, have taken a hybrid approach to the issue of willfulness in the purlieus of Subchapter II. This approach is marked by its protean quality. Depending on the language of each particular regulatory provision, the word "willfully" as used in section 5322 takes on a variety of meanings, allowing mistake of law as a defense to certain crimes and not to others. This viewpoint is best typified by Scanio and ______ its progeny. See Scanio, 900 F.2d at 490 (permitting mistake-of- ___ ______ law defense as to some currency-related crimes while prohibiting such a defense vis-a-vis other currency-related crimes); see also ___ ____ cases collected supra at p. 9. _____ We think that all three of these definitions create needless problems. The government's theory undervalues the statute's language by reading willfulness as if it were simply a ____________________ regulatory statutes, it seemed to me useful to superimpose some norm of meaning on it. American Law Institute, Model Penal Code 2.20, at 249 n.47 _________________ (1985). 11 synonym for general intent.6 In contrast, appellants' theory, if applied across the board, would allow all mistakes of law, no matter how unreasonable, to serve as bucklers against prosecution, and, in the bargain, would vitiate the general principle that "deliberate ignorance and positive knowledge are equally culpable." United States v. Jewell, 532 F.2d 697, 700 _____________ ______ (9th Cir.), cert. denied, 426 U.S. 951 (1976). Last, while _____ ______ Scanio and its progeny adopt a flexible definition of ______ willfulness, they neither speak to the mens rea for CTR ____ ___ violations nor answer the critical question of how differing definitions can attach to a single usage of an operative term in a single statutory section. For our part, we take yet a fourth tack a tack adumbrated by the course we set in United States v. Bank of New _____________ ____________ England, 821 F.2d 844 (1st Cir.), cert. denied, 484 U.S. 943 _______ _____ ______ (1987). In that case, we plotted the intersection between section 5322's willfulness criterion and section 5313's CTR requirements. See id. at 854-59. Bank of New England had failed ___ ___ to prepare CTRs when a customer repeatedly withdrew cash aggregating over $10,000 by means of multiple checks, each written for slightly under $10,000. The bank argued that it had not engaged in willful misconduct because it had not "violated a ____________________ 6It is a common rule of statutory interpretation that courts must give effect to legislative terms wherever possible. See ___ Gade v. National Solid Wastes Management Ass'n, 112 S. Ct. 2374, ____ ______________________________________ 2384 (1992); United States v. Menasche, 348 U.S. 528, 538-39 _____________ ________ (1955). We cite this familiar tenet because there would have been no need for Congress to include the term "willfully" at all if the government's reading of section 5322 were accurate. 12 known legal duty." Id. at 856. We rejected the bank's plea ___ because the evidence revealed that the bank's professed unawareness about whether the reporting requirements applied to the transactions was a product of the bank's deliberate blindness. See id. at 856, 857. ___ ___ Our opinion in Bank of New England is not pathbreaking; ___________________ it merely represents a particularized application of the rule defenestrating mistake-of-law defenses when the mistakes in question result from intentional or reckless disregard of a legal duty. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, ___ __________ __________________ 135 n.13 (1988) (willfulness may be shown either by actual knowledge or by "reckless disregard for the matter of whether [defendant's] conduct was prohibited by the statute"); Trans _____ World Airlines, Inc. v. Thurston, 469 U.S. 111, 126-28 (1985) _____________________ ________ (similar); see also Bank of New England, 821 F.2d at 886 ("the ___ ____ ____________________ Supreme Court has endorsed defining willfulness, in both civil and criminal contexts, as 'a disregard for the governing statute and an indifference to its requirements'") (quoting Trans World ___________ Airlines, 469 U.S. at 127). ________ We adhere today to the teachings of Bank of New England ___________________ and build upon that foundation. We believe that, in respect to alleged violations of the BFTRA's CTR provisions, section 5322's willfulness criterion demands that the government prove either the violation of a known legal duty or the reckless disregard of the same. See Bank of New England, 821 F.2d at 866. We move ___ ___________________ forward from that point, therefore, to consider a question not 13 present in Bank of New England: the significance of section 5322 ___________________ in the antistructuring context. C. Willful Structuring: One Word, One Meaning. C. Willful Structuring: One Word, One Meaning. ______________________________________________ Section 5322 provides criminal sanctions for both CTR and structuring offenses. As we determine the mens rea ____ ___ requirement for the latter group of crimes, it is axiomatic that the plain words and structure of the statute must be paramount. See, e.g., Pennsylvania Dep't of Pub. Welfare v. Davenport, 495 ___ ____ __________________________________ _________ U.S. 552, 557-58 (1990); Stowell v. Ives, 976 F.2d 65, 69 (1st _______ ____ Cir. 1992). Ordinarily, "identical terms within an Act bear the same meaning." Estate of Cowart v. Nicklos Drilling Co., 112 S. ________________ ____________________ Ct. 2589, 2596 (1992); accord Sullivan v. Stroop, 496 U.S. 478, ______ ________ ______ 484 (1990). In the case at hand, the Cowart presumption is ______ particularly strong. We explain briefly. While courts have found on infrequent occasion that Congress intended a word to have different connotations when used in different provisions of the same Act, see, e.g., Greenwood ___ ____ _________ Trust Co. v. Massachusetts, 971 F.2d 818, 830 n.10 (1st Cir. __________ _____________ 1992), petition for cert. filed, 61 U.S.L.W. 3382 (U.S. Nov. 4, ________ ___ _____ _____ 1992) (No. 92-794); New Eng. Tel. & Tel. Co. v. Public Utils. _________________________ ______________ Comm'n, 742 F.2d 1, 8 (1st Cir. 1984), cert. denied, 476 U.S. ______ _____ ______ 1174 (1986), those instances almost always involve, at a bare minimum, multiple uses of a term or phrase within a panoramic statutory scheme. Here, however, we are not dealing with repetitions of a word at diverse points in a statute, but with a single word in a single statutory section. Ascribing various 14 meanings to a single iteration of a single word reading the word differently for each code section to which it applies would open Pandora's jar. If courts can render meaning so malleable, the usefulness of a single penalty provision for a group of related code sections will be eviscerated and, by extension, almost any code section that references a group of other code sections would become susceptible to individuated interpretation. Furthermore, if Congress wanted the purposive mens rea ____ ___ in the antistructuring statute to stand alone, it had several simple options. It could, for example, have placed the antistructuring provision somewhere other than in Subchapter II, or amended the criminal sanctions provision to except structuring violations.7 It exercised none of the available options. Thus, absent powerful evidence to the contrary, we believe courts should presume that Congress intended the mens rea set by section ____ ___ 5322 to apply in equal measure to both CTR violations and structuring offenses. We recognize, of course, that notwithstanding these problems, several other courts have scuttled the Cowart ______ presumption and read the word "willfully" in section 5322 differently as it applies to breaches of different currency regulations. Compare, e.g., Brown, 954 F.2d at 1568 (ruling that _______ ____ _____ ____________________ 7In fact, Congress chose precisely this course for the provision requiring reports on foreign currency transactions, 31 U.S.C. 5315, leaving only civil penalties available for enforcement of that provision. See 31 U.S.C. 5322(a)-(b). ___ 15 knowledge of the antistructuring law was not required to ground a structuring conviction) and Scanio, 900 F.2d at 490 (same) with, ___ ______ ____ e.g., United States v. Eisenstein, 731 F.2d 1540, 1543 (11th Cir. ____ _____________ __________ 1984) (upholding mistake-of-law defense for currency import and export violations) and United States v. Dichne, 612 F.2d 632, 636 ___ _____________ ______ (2d Cir. 1979) (similar), cert. denied, 445 U.S. 928 (1980). See _____ ______ ___ also Dashney, 937 F.2d at 539-40 (declaring mistake of law to be ____ _______ a defense in respect to violations of currency import and export regulations but not in respect to structuring offenses). To warrant redefining "willfully" from crime to crime within the same statute, these courts generally attempt to distinguish antistructuring regulations from, say, currency importing regulations, on the basis of the "reasonable probability that knowledge [of the law] might be obtained" more easily in the former situation than in the latter. Scanio, 900 F.2d at 490 ______ (citation omitted). We must respectfully disagree with these courts. The distinction that they draw simply does not justify the transmogrification of the word "willfully" into a statutory chameleon. We are, moreover, particularly chary about adopting so pleochroic an approach in light of the more consistent, less complicated alternative offered in Bank of New England, 821 F.2d ___________________ at 856. That alternative, which derives great vitality from the Supreme Court's language, see McLaughlin, 486 U.S. at 133; Trans ___ __________ _____ World Airlines, 469 U.S. at 126, provides a fair, workable, _______________ mistake-of-law defense to those accused of currency-related 16 crimes and at the same time ensures that defendants who know of the law's requirements in a general sense, but recklessly or intentionally fail to investigate the legality of structuring or other proscribed activity, will be found guilty. We hold, therefore, that the plain language of section 5322 governs; that the unitary willfulness standard of section 5322 should be given an identical meaning with respect to structuring and CTR violations;8 and that, therefore, an ____________________ 8Because this issue is susceptible to resolution in terms of the plain meaning and structure of the statute, we need not probe the legislative history. See United States v. Charles George ___ _____________ ______________ Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987) (one should _____________ "resort to the legislative history and other aids of statutory construction only when the literal words of the statute create ambiguity or lead to an unreasonable interpretation") (citation and internal quotation marks omitted); accord Barnhill v. ______ ________ Johnson, 112 S. Ct. 1386, 1391 (1992); Stowell, 976 F.2d at 69. _______ _______ We note in passing, however, that while the legislative history with regard to section 5322 and the antistructuring amendments in no way contradicts our analysis of how the word "willfully" should be construed, this is yet another case where the legislative history of a statute "is more conflicting than the text is ambiguous." Wong Yang Sung v. McGrath, 339 U.S. 33, 49 ______________ _______ (1950). The report issued by the House of Representatives in conjunction with the bill which included the criminal sanctions section now codified as 31 U.S.C. 5322 merely recapitulated the Act's criminal provisions. And, although the House and Senate issued seventeen reports dealing with a salmagundi of proposed bills, features of which were amalgamated into the Anti-Drug Abuse Act of 1986 (the bill which contained the antistructuring provision now codified as 31 U.S.C. 5324), there was no House or Senate report accompanying the Act. See 1986 U.S.C.C.A.N. ___ 5393 (noting the absence of a report but listing related reports). To be sure, the House considered and rejected several alterations to section 5322 that would have changed the term "willfully" to "knowingly." See, e.g., H.R.Rep. No. 855, ___ ____ 99th Cong., 2d Sess. 7, 27 (1986). The Senate likewise considered legislation designed to make section 5322 read "knowingly" instead of "willfully." See S. 2683, 99th Cong., 2d ___ Sess. (1986). The purpose of this proposed change was to eliminate the possibility of antistructuring liability premised 17 unintentional, non-reckless mistake of law is a complete defense to a structuring charge. D. Willfulness in the Tax Code. D. Willfulness in the Tax Code. ______________________________ In an effort to read the word "willfully" in a more charitable manner, all three appellants urge that the Court's recent decision in United States v. Cheek, 111 S. Ct. 604 (1991), _____________ _____ signifies that federal courts should apply a purely subjective standard to virtually all white-collar crimes that require a mens ____ rea of willfulness as an element of the offense. Such a standard ___ differs from the standard we endorse today because it would allow mistakes born of intentional or reckless ignorance to insulate defendants from criminal liability. Donovan's case illustrates the practical effect of this suggestion: had the trial judge defined willfulness exclusively in terms of a subjective intent to disobey the law, the jury might have exonerated the defendant on the basis of a genuine, albeit reckless, misunderstanding about the law's requirements. We do not think that Cheek can carry the cargo that _____ ____________________ upon "reckless disregard" of the law. See S. Rep. No. 99-433, ___ 99th Cong., 2d Sess. 1, 8 (1986). The amendment failed. We see no point in reciting additional book and verse. The most serviceable conclusion that can be woven from the language in the sundry reports attached to ultimately unsuccessful legislation is that, during the extended drafting and redrafting of various bills respecting currency transactions, Congress, or at least some of its members, reconsidered the mens ____ rea of section 5322, assessed its relationship with the proposed ___ antistructuring provision, and elected not to act. 18 appellants load upon it.9 Cheek was a criminal tax case. The _____ Court noted that the term "willfully," as used in criminal tax statutes, had long been interpreted "as carving out an exception to the traditional rule" that ignorance of the law affords no defense to a criminal prosecution. Id. at 609. Nowhere in ___ Cheek, or in the Court's earlier opinions involving criminal _____ prosecutions under the tax laws, see, e.g., United States v. ___ ____ ______________ Pomponio, 429 U.S. 10 (1976) (per curiam); United States v. ________ ______________ Bishop, 412 U.S. 346 (1973); United States v. Murdock, 290 U.S. ______ _____________ _______ 389 (1933), is there any indication that courts should use a purely subjective standard in evaluating state-of-mind defenses under other federal statutes. Rather, the Cheek Court repeatedly _____ qualified its discussion of the point by referring to the special context criminal tax prosecutions from whence the discussion proceeded. See, e.g., Cheek, 111 S. Ct. at 609, 610. The ___ ____ _____ Court's earlier opinions stressed the same point. See, e.g., ___ ____ Pomponio, 429 U.S. at 12 & n.3; Bishop, 412 U.S. at 360-61. This ________ ______ repeated qualification makes clear that the Court has crafted a narrow exception, limited to tax cases, in which subjective mistake of law can constitute an absolute defense. Such a conclusion coheres with our long-held ____________________ 9Our dissenting brother suggests that it is unnecessary for us to discuss the range of Cheek. See post at 33. We disagree. _____ ___ ____ If the Cheek rationale extended beyond the boundaries of the tax _____ code, as appellants claim it does, the result we reach today would be altered, at least as to appellant Aversa. Moreover, it is essential to any careful understanding of section 5322's willfulness standard that we consider, and account for, the Court's explication of a parallel problem arising under the tax code. 19 understanding of the tax-crime exception. In United States v. _____________ Aitken, 755 F.2d 188 (1st Cir. 1985), we acknowledged the ______ uniqueness of the tax statutes' mens rea requirements. See id. ____ ___ ___ ___ at 193 ("That internal revenue reporting and filing requirements are an enclave apart is recognized."). We read Cheek as _____ confirming and fortifying the stance that we took in Aitken. ______ Moreover, and finally, the rationales supporting a subjective mistake-of-law defense in tax-crime cases do not apply to laws and regulations of the kind at issue here. As the Second Circuit noted, "[o]ne of the most esoteric areas of the law is that of federal taxation. It is replete with 'full-grown intricacies,' and it is rare that a 'simple, direct statement of the law can be made without caveat.'" United States v. Regan, _____________ _____ 937 F.2d 823, 827 (citation omitted), modified, 946 F.2d 188 (2d ________ Cir. 1991), cert. denied, 112 St. Ct. 2273 (1992). The federal _____ ______ tax code is not only enormous, detailed, and technical, but also interrelated and highly nuanced. Simply reading the words of the tax code does not always reveal the line between legal and illegal conduct. And for over sixty years, the Supreme Court has held that Congress does not intend to punish those who, in good faith, stray past that line. For these reasons, we join the courts of appeals that have found the Cheek doctrine inapplicable to criminal _____ prosecutions under the currency reporting laws.10 See, e.g., ___ ____ ____________________ 10Attempts to expand Cheek's horizons have been regularly _____ rejected in most other contexts as well. See, e.g., United ___ ____ ______ States v. Hollis, 971 F.2d 1441, 1451 (10th Cir. 1992) (rejecting ______ ______ 20 United States v. Beaumont, 972 F.2d 91, 94-95 (5th Cir. 1992); ______________ ________ Brown, 954 F.2d at 1569 n.2; Caming, 968 F.2d at 241; Dashney, _____ ______ _______ 937 F.2d at 539-40. The currency statutes are comparatively few in number, target a much narrower range of conduct, and under the current regulations affect a considerably smaller constituency. The regulatory scheme, overall, is not intricate or even especially subtle. We think these distinctions are dispositive. Accordingly, we reaffirm Aitken and continue to hold that the ______ Cheek exception is restricted to tax crimes. In a prosecution _____ brought under Subchapter II, as we have explained, the criminal intent required for conviction is either the violation of a known legal duty or reckless disregard of the law. Consequently, appellants' requests for the application of a wholly subjective standard were properly denied by Judges Loughlin and Devine. III. APPLYING THE LAW III. APPLYING THE LAW All that remains is for us to apply the fruits of our analysis to each appellant's situation. A. Donovan. A. Donovan. ___________ In Donovan's case, the trial judge instructed the jury that Donovan's actions were willful if he had the "bad purpose to ____________________ extension of Cheek to loan fraud context); United States v. Gay, _____ _____________ ___ 967 F.2d 322, 327 (9th Cir.) (same; mail fraud case), cert. _____ denied, 113 S. Ct. 359 (1992); United States v. Chaney, 964 F.2d ______ _____________ ______ 437, 446 n.25 (5th Cir. 1992) (same; bank fraud case); United ______ States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991) (same; mail ______ _______ and wire fraud prosecution). A few courts, however, particularly those faced with cases involving the willful destruction of government property, have applied a Cheek-like standard. See, _____ ___ e.g., United States v. Mills, 835 F.2d 1262, 1265 (8th Cir. ____ ______________ _____ 1987); United States v. Moylan, 417 F.2d 1002, 1004 (4th Cir. _____________ ______ 1969), cert. denied, 397 U.S. 910 (1970). _____ ______ 21 disobey or to disregard the law." While Judge Devine did not give the exact instruction which Donovan requested, the instruction he gave was almost identical to the instruction which we approved for CTR violations in Bank of New England, 821 F.2d ____________________ at 855. Moreover, Donovan's requested instruction focused on bad motive and the Cheek Court made clear that a showing of bad _____ motive is more restrictive than necessary, even under the tax- crime standard. See Cheek, 111 S. Ct. at 610; see also Pomponio, ___ _____ ___ ____ ________ 429 U.S. at 13. Finally, the judge allowed the parties to introduce evidence pertaining to Donovan's state of mind regarding the law and the facts. The trial court which, in instructing the jury, had no obligation to parrot the precise language favored by either side gave a charge that, viewed in its entirety, adequately explained the legal issues, including every legitimate theory upon which Donovan's defense could rest. No more was exigible. See United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992); ___ ______________ ______ United States v. Nivica, 887 F.2d 1110, 1124 (1st Cir. 1989), _____________ ______ cert. denied, 494 U.S. 1005 (1990). This is especially true _____ ______ where, as here, the defendant's subjective mistake-of-law proposal went well beyond what the law requires in its insistence upon proof of evil motive. See, e.g., United States v. David, ___ ____ _____________ _____ 940 F.2d 722, 738 (1st Cir. 1991) (holding that the district court may appropriately refuse to give a proposed jury instruction "which is incorrect, misleading, or incomplete in some material respect"), cert. denied, 112 S. Ct. 605, 908, 1298, _____ ______ 22 2301 (1992). B. Aversa and Mento. B. Aversa and Mento. ____________________ We find the remaining appeals to be cut from different cloth. Because of restrictive rulings made below, neither Aversa nor Mento ever had a chance to present a mistake-of-law defense. Both of them were precluded by the government's successful motion in limine from offering any evidence as to their ignorance of the __ ______ antistructuring law. Additionally, in Mento's case the district judge charged the jury that mistake of law was no defense, declaring: "It is not necessary that the United States prove that the defendant knew that the structuring of his currency transactions was unlawful." Since neither of these defendants were afforded an opportunity to develop the record, and since both of them claim not to have known that what they did was illegal, we cannot say what a fully amplified record might show regarding Aversa's and Mento's familiarity with, or actual knowledge of, the antistructuring law.11 Similarly, we cannot say how the proof might shape up in respect to reckless disregard or deliberate blindness. It follows inexorably that, on this scumbled record, Aversa's and Mento's convictions cannot stand. IV. CONCLUSION IV. CONCLUSION We need go no further. In the context of the antistructuring and CTR provisions of Subchapter II, we find that ____________________ 11We do know, however, that in the plea agreement the government stipulated that it had no evidence of actual knowledge on Aversa's part. 23 a willful action is one committed in violation of a known legal duty or in consequence of a defendant's reckless disregard of such a duty. In Donovan's case, the introduction of evidence was not unduly restricted and the district court's charge to the jury was adequate to comport with the proper standard. Thus, his appeal fails.12 Because neither Aversa nor Mento had a chance to present evidence on a mistake-of-law theory, and because the trial court's jury instruction in Mento's case was harmfully erroneous, their convictions must be vacated and their cases remanded for further proceedings. By the terms of Fed. R. Crim. P. 11(a)(2), Aversa may, if he so elects, withdraw his guilty plea in the court below. See United States v. Lyons, 898 F.2d ___ _____________ _____ 210, 214 n.5 (1st Cir.), cert. denied, 111 S. Ct. 295 (1990). _____ ______ In Appeal No. 91-1574, the judgment of conviction is In Appeal No. 91-1574, the judgment of conviction is _______________________________________________________ affirmed. affirmed. ________ In Appeals Nos. 91-1363 and 91-1364, the judgments of In Appeals Nos. 91-1363 and 91-1364, the judgments of _______________________________________________________ conviction are vacated and the cases remanded for further conviction are vacated and the cases remanded for further _________________________________________________________________ proceedings not inconsistent herewith. proceedings not inconsistent herewith. _____________________________________ Concurring Opinion follows Dissent follows Concurring Opinion ____________________ 12Donovan's remaining ground of appeal was convincingly dispatched in the prior panel opinion. Hence, we reinstate that opinion in redacted form, expressly adopting Part IV thereof. 24 BREYER, Chief Judge (concurring). I believe that ___________ criminal prosecutions for "currency law" violations, of the sort at issue here, very much resemble criminal prosecutions for tax law violations. Compare 26 U.S.C. 6050I, 7203 _______ with 31 U.S.C. 5322, 5324. Both sets of laws are ____ technical; and both sets of laws sometimes criminalize conduct that would not strike an ordinary citizen as immoral or likely unlawful. Thus, both sets of laws may lead to the unfair result of criminally prosecuting individuals who subjectively and honestly believe they have not acted criminally. United States v. Cheek, 111 S. Ct. 604 (1991), _____________ _____ sets forth a legal standard that, by requiring proof that the defendant was subjectively aware of the duty at issue, would avoid such unfair results. Were I writing on a blank slate, the similarity of the two sets of criminal laws might well lead me to conclude that the same standards should apply in both sets of cases. Other circuits, however, have distinguished "currency reporting" cases from Cheek. See en _____ ___ banc opinion, supra at p. 20. Moreover, Supreme Court _____ opinions have strongly suggested that criminal tax cases constitute a separate enclave in the law. See en banc ___ opinion, supra at pp. 18-19. _____ 25 25 In addition, the court today announces a standard that does not threaten to allow conviction of a defendant with an innocent state of mind. Under the court's standard, the government must prove that the defendant either subjectively knew of his legal duty, or that he was "reckless" in respect to the existence of that duty. Cf. ___ McLaughlin v. Richland Shoe Co., 486 U.S. at 135 n.13 (even __________ _________________ objectively unreasonable failure to determine correct legal obligation is not "willful," as long as such failure falls short of recklessness). One can imagine how a person frequently in contact with these laws, such as a financial officer or drug-fund courier, could be found to have been "reckless" in failing to learn relevant legal data. However, it is difficult to see how one could convict an ordinary citizen on this basis, i.e., in the absence of ____ actual, subjective knowledge of the legal duty, for "recklessness" involves the conscious disregard of a substantial risk. See Model Penal Code 2.02(2)(c)(1985); ___ cf. United States v. Murdock, 290 U.S. 389, 395 (1933) ___ ______________ _______ (conduct is "willful" in the context of a criminal statute if it is "marked by careless disregard [for] whether or not one has the right to act"). 26 26 I therefore conclude that the court's announced standard is sufficiently close to the purely subjective standard set forth in Cheek that it will avoid using the _____ criminal law, in this technical area, to punish those with an innocent state of mind, those who did not know they were violating the law and who reasonably failed to investigate the issue. I therefore join the court's opinion. Dissent follows 27 27 TORRUELLA, Circuit Judge (Dissenting). Although I _____________ agree with much of what is stated by the majority, and even more with Chief Judge Breyer's concurrence, I write separately because I believe neither opinion goes far enough. In my view the prosecution of these cases is defective on two grounds: (1) As clearly reflected in the legislative history of these statutes, appellants are improper targets of money laundering accusations, and (2) even if the charges are within statutory scope, the standard of scienter in Cheek v. United States, 498 U.S. 192 _____ _____________ (1991), is applicable to them. I. ACTIVITY TARGETED BY THE BANK I. ACTIVITY TARGETED BY THE BANK _________________________________ SECRECY ACT, AS AMENDED BY THE SECRECY ACT, AS AMENDED BY THE _________________________________ MONEY LAUNDERING CONTROL ACT MONEY LAUNDERING CONTROL ACT ____________________________ I need not repeat the facts as stated by the majority. I will only emphasize that appellants are neither the recipients of illegal drug funds or engaged in laundering money proceeds from criminal ventures, nor are they income tax evaders. In fact, particularly in the case of appellants Aversa and Mento, they did nothing prior to the alleged "structuring" actions that even approximates the commission of a criminal offense. I focus on the Bank Secrecy Act and its more recent amendment, the Money Laundering Control Act, to determine whether appellants' actions are within the purview of the conduct that Congress intended to criminalize by this legislation. -28- 28 The Bank Secrecy Act, enacted in 1970, was part of the Bank Records and Foreign Transaction Act.13 The unequivocal concern of this complex legislation was to prohibit the use of foreign banks to "launder" the proceeds of illegal activity or evade federal income taxes.14 It became apparent, however, that these enactments had little impact on large-scale money laundering related to illegal drug transactions, and that illicit funds were flowing in ever-increasing amounts into financial institutions in the United States.15 As a result, Congress enacted the Anti-Drug Abuse Act of 1986,16 Title I, subtitle H of which was the Money Laundering Control Act of 1986. This subtitle included an anti-structuring provision.17 One thing clearly emerges from the legislative history of this statute: Congress wished to attack money laundering associated with organized crime or related criminal activity, particularly the illicit drug trade. See S. Rep. No. 433, 99th ___ Cong., 2d Sess. (1986) (accompanying S. 2683). A casual review of the Senate Report accompanying this Act reveals that the term "money laundering," or its equivalent, is used more than 100 ____________________ 13 Pub. L. No. 91-508, 84 Stat. 1114 (1970) (codified as amended in scattered sections of 12 U.S.C., 15 U.S.C. and 31 U.S.C.). 14 S. Rep. No. 433, 99th Cong., 2d Sess. 2-3 (1986). 15 See The President's Commission on Organized Crime, Interim ___ Report to the President and the Attorney General, The Cash _________ Connection: Organized Crime, Financial Institutions, and Money _________________________________________________________________ Laundering (1984); S. Rep. No. 433 (1986). __________ 16 Pub. L. No. 99-570, 100 Stat. 3207. 17 31 U.S.C.A. 5324 (West Supp. 1992). -29- 29 times, and that it refers to organized crime and criminal activity on no less than 53 occasions. Id. The House Report ___ displays a similar preoccupation. See H.R. Rep. No. 746, 99th ___ Cong., 2d Sess. (1986) (accompanying H.R. 5176). The first major heading of this report is "Drug Trafficking and Money Laundering." Id. at p. 16. The report refers to "money ___ laundering" approximately 73 times, and to organized crime and illegal drug trafficking 53 times. Given the congressional preoccupation with money laundering it is surprising that neither the term "money laundering," nor the new crime created by the Money Laundering Control Act, "structuring," are defined by the statute. Nevertheless, the House Report states the following: Money Laundering Defined. - The _____________________________ President's Commission on Organized Crime has defined money laundering as the "process by which one conceals the existence, illegal source, or illegal application of income, and then disguises that income to make it appear legitimate." In other words, laundering involves the hiding of the paper trail that connects income or money with a person in order for such person to evade __________________________________ the payment of taxes, avoid prosecution, _________________________________________ or obviate any forfeiture of his illegal _________________________________________ drug income or assets. . . . _____________________ Id. at 16 (emphasis supplied). ___ I derive additional guidance from the Senate Report that discusses what later became 18 U.S.C. 1956(a)(1), which is entitled Laundering of Monetary Instruments. See S. Rep. No. 433 __________________________________ ___ at 9. The report calls section 1956 "the basic money laundering -30- 30 offense." Id. That section, which in effect defines ___ "laundering," provides: -31- 31 Whoever knowing that the property _________________________________________ involved in a financial transaction _________________________________________ represents the proceeds of some form of _________________________________________ unlawful activity, conducts or attempts __________________ to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--(B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law . . . . [will be liable for conviction under this section]. 18 U.S.C. 1956(a)(1) (emphasis supplied). On the other hand, "structuring" is only defined by regulation. 31 C.F.R. 103.53, entitled "Structured Transactions," provides that: No person shall for the purpose of evading the reporting requirement of 103.22 with respect to such transaction: . . . (c) Structure (as that term is defined in 103.11(n) of this part) or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions. 31 C.F.R. 103.53. Regulation 31 C.F.R. 103.11(n) (1989) defines "structure" or "structuring" as: (n) Structure (structuring). For ________________________ purposes of section 103.53, a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on -32- 32 one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this Part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition. 31 C.F.R. 103.11(n) (1989); see also S. Rep. No. 433 at 22, 25 ________ ("structuring" is "breaking up of what is really one financial transaction into several smaller ones to evade reporting requirements"). During the hearings preceding enactment of this legislation concern was expressed that this maze of interwoven regulations and statutes, although aimed at crippling organized crime, "could lead to prosecution of people who were not in any way involved in money laundering." See S. Rep. No. 433 at 12; ___ see also John K. Villa, A Critical View of Bank Secrecy Act _________ ______________________________________ Enforcement and the Money Laundering Statute, 37 Cath. U.L. Rev. ____________________________________________ 489 (1988). The present appeals are living proof of that prophecy. Appellants are being prosecuted for violation of the money laundering statutes notwithstanding that they are not in any way involved in such activities. The situation presented by these charges is not unlike that in McNally v. United States, 483 U.S. 350 (1987), in which _______ _____________ the Supreme Court reversed a unanimous litany of circuit court -33- 33 decisions18 condoning the extension of the federal mail fraud statute19 beyond the scope of Congress' intended coverage. In charging appellants under the money laundering statutes the government similarly overlooked that "[i]n considering the scope of [a] statute it is essential to remember Congress' purpose in enacting it." Id. at 365 (Stevens, J., dissenting). ___ In prosecuting appellants under the Bank Secrecy Act as amended by the Money Laundering Control Act, the government has transgressed Congress' purpose in the enactment of these statutes, which was to detect and punish "financial transaction[s] represent[ing] the proceeds of some form of unlawful activity," 18 U.S.C. 1956(a)(1). We should not stand idly while this overreaching transforms common citizens into criminals. II. THE CHEEK STANDARD II. THE CHEEK STANDARD __________________ While it could have been possible to leave Cheek v. _____ United States, 498 U.S. 192, 111 S. Ct. 604 (1991), out of this _____________ appeal altogether, the majority opinion seeks to restrict its present and future use by preemptive action. I believe it would be more appropriate to consider one case at a time. Furthermore, lest there be any doubt, I certainly am not of the view that the Cheek standard should apply in blanket fashion "to virtually all _____ white collar crimes that require a mens rea of willfulness as an ____ ___ ____________________ 18 Including some from this circuit. See, e.g., United States ___ ____ ______________ v. Silvano, 812 F.2d 754 (1st Cir. 1987). _______ 19 18 U.S.C. 1341. -34- 34 element of the offense." Ante at 18. In my view each ____ legislative scheme must be separately pondered to determine whether Cheek applies. But I cannot agree that because Cheek was _____ _____ an income tax case that the principle espoused therein regarding mens rea is necessarily limited to such tax cases. I can find ____ ___ nothing in Cheek to justify such a conclusion or limitation. _____ Logic and fundamental fairness dictate that some traditional legal maxims, up to now blindly accepted, make little sense in the context of some of today's complex regulatory environments. Ultimately Cheek stands for the proposition that at some point a _____ legal fiction may so depart from reality as to be untenable as a basis for criminal responsibility. In Cheek, the Supreme Court examined the meaning of _____ "willfully" as used in the income tax statutes. Defendant Cheek, a commercial airline pilot, refused to file income tax returns after 1979. As a result, Cheek was indicted and charged with willfully violating 26 U.S.C. 7203 & 7201.20 At trial, Cheek presented as his defense that "he sincerely believed that the tax laws were being unconstitutionally enforced and that his actions during 1980-1986 period were lawful." Cheek, 498 U.S. at ___, 111 S. Ct. at 607. _____ During deliberations, the jury was divided on whether Cheek honestly and reasonably believed that he was not required to pay ____________________ 20 Section 7201 criminalizes the "willful[] attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof." 26 U.S.C. 7201. Section 7203 criminalizes the willful failure to file a return as required under Title 26. -35- 35 income taxes. However, the district court instructed the jury "that a good-faith misunderstanding of the law or a good faith belief that one is not violating the law, if it is to negate willfulness, must be objectively reasonable." 498 U.S. at ___, 111 S. Ct. at 608. With this instruction in hand, the jury found Cheek guilty on all counts. Cheek appealed on the ground that this instruction was erroneous. The Seventh Circuit affirmed. The Supreme Court, relying on its prior criminal tax precedents interpreting the word "willfully," reversed Cheek's conviction. It held that no matter how unreasonable a judge might deem Cheek's beliefs, the jury must have the opportunity to hear them and make the final determination as to whether he had a good faith misunderstanding of the law or a good faith belief that he was not violating the law, thus negating the element of willfulness. 498 U.S. at ___, 111 S. Ct. at 610.21 Cheek establishes that the government must prove in a _____ criminal tax case a "willful" violation, which requires proof that a defendant voluntarily and intentionally violated a known legal duty. 498 U.S. at ___, 111 S. Ct. at 611. More in point with the present appeals, however, the Court stressed that [t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties ____________________ 21 The Court therefore held that the district court erred when it instructed the jury that Cheek's "asserted beliefs that wages are not income and that he was not a taxpayer within the meaning of the Internal Revenue Code should not be considered by the jury in determining whether Cheek has acted willfully." 498 U.S. at ___, 111 S. Ct. at 613. -36- 36 and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. 498 U.S. at ___, 111 S. Ct. at 609. The Court could well have been talking about the arcane money laundering regulatory scheme presented by these appeals. It is pointed out that the application of Cheek to the _____ anti-structuring statute was rejected by the Tenth Circuit in United States v. Dashney, 937 F.2d 532 (10th Cir.), cert. denied, _____________ _______ ____________ 60 U.S.L.W. 3343 (1991), and that other courts have followed Dashney's analysis. See United States v. Brown, 954 F.2d 1563 _______ ___ ______________ _____ (11th Cir. 1992); United States v. Rogers, No. 91-5106, slip op. _____________ ______ (4th Cir. Apr. 24, 1992). In Dashney, the court concluded that the anti- _______ structuring act did not require, as an element of the offense, proof of a specific intent to violate the act because, the provisions of the anti-structuring act are "straightforward" when compared to the criminal tax statutes at issue in Cheek. _____ Dashney, 937 F.2d at 540. After spending a considerable amount _______ of time studying these statutes and regulations, as well as their legislative history, I must confess to a different view. The conclusion that engaging in a currency transaction is more "straightforward" than filing an income tax return is at best, unconvincing. The legal duty at issue here -- the illegality of structuring a transaction in order to prevent a bank from filing a currency transaction report -- does not even -37- 37 approximate the general knowledge of the duty of taxpayers to file an income tax return.22 The statutes criminalizing the conduct of failing to file an income tax return have been around for more than 70 years whereas the anti-structuring act did not clearly criminalize the conduct of structuring transactions until 1986, when Congress enacted 31 U.S.C. 5324 and 5522.23 If nothing else emerges from a study of this byzantine labyrinth of legislation and regulation, it is that an unsuspecting common citizen can easily fall prey to this uncommon area of the law. Apparently, with this in mind the Treasury Department proposed, but failed to adopt, regulations aimed at publicizing the criminal offense underlying 5324. See 54 Fed. Reg. 20,398 ___ ____________________ 22 In Cheek, Justice Blackmun, with whom Justice Marshall joined _____ in dissent, stated that: [I]t is incomprehensible to me how, in this day, more than 70 years after the institution of our present federal income tax system . . . any taxpayer of competent mentality can assert as his defense to charges of statutory willfulness the proposition that the wage he receives for his labor is not income . . . . 498 U.S. at ___, 111 S. Ct. at 615. 23 In fact, until the enactment of the Money Laundering Act, a conflict among the circuits existed as to whether it was a crime to structure deposits for the purpose of preventing the bank from reporting. Compare United States v. Larson, 796 F.2d 244, 246-47 _______ _____________ ______ (8th Cir. 1986); United States v. Varbel, 780 F.2d 758, 760-63 _____________ ______ (9th Cir. 1986); United States v. Denemark, 779 F.2d 1559, 1561- _____________ ________ 64 (11th Cir. 1986); United States v. Anzalone, 766 F.2d 676, ______________ ________ 679-83 (1st Cir. 1985) with United States v. Heyman, 794 F.2d ____ _____________ ______ 788, 790-93 (2d Cir.), cert. denied, 479 U.S. 989 (1986); United ____________ ______ States v. Cook, 745 F.2d 1311, 1314-16 (10th Cir. 1984), cert. ______ ____ _____ denied, 469 U.S. 1220 (1985); United States v. Tobon-Builes, 706 ______ _____________ ____________ F.2d 1092, 1096-1101 (11th Cir. 1983). -38- 38 (1989). It is obvious that our Anzalone opinion had little ________ effect on bureaucratic thinking. See Anzalone, 766 F.2d at 681- ___ ________ 82. I recognize, as has the majority, that not all appellants are in the same legal position on this last issue. In my opinion, in case No. 91-1574, appellant Donovan received substantially the jury charge that he was entitled to under Cheek. Appellants Aversa and Mento in cases Nos. 91-1363 and 91- _____ 1364 did not. The problem is, nevertheless, that in my view none of the appellants should have been charged because, as previously explained, the government overstretched its anti-moneylaundering net. Consequently, I must dissent. -39- 39